Filed 5/29/14

# IN THE SUPREME COURT OF CALIFORNIA

LONG BEACH POLICE OFFICERS
ASSOCIATION,

        Plaintiff and Appellant,

        v.

CITY OF LONG BEACH et al.,

        Defendants and Appellants;

LOS ANGELES TIMES
COMMUNICATIONS LLC,

        Real Party in Interest and
        Respondent.

S200872

Ct.App. 2/2 B231245

Los Angeles County
Super. Ct. No. NC055491

 

A newspaper asked a city to release the names of police officers involved in certain shootings while on duty. The police union then sought injunctive relief against the city in superior court, attempting to prevent release of the names. The newspaper intervened (seeking disclosure of the names), and the city then aligned itself with the union (opposing disclosure). The trial court denied the union's request for a permanent injunction; that denial was upheld on appeal. We granted the separate petitions for review filed by the city and the union. We now affirm the judgment of the Court of Appeal.

Shortly before 5:00 p.m., on December 12, 2010, two City of Long Beach police officers responded to a resident's telephone call about an intoxicated man brandishing a "six-shooter" on neighboring property. At the sight of the two officers, the man (35-year-old Douglas Zerby) pointed at them an object resembling a gun. The officers immediately fired multiple rounds at Zerby, killing him. It turned out that the object Zerby was holding was a garden hose spray nozzle with a pistol grip.

Three days later, reporter Richard Winton of the Los Angeles Times (the Times), asked the Long Beach City Attorney's Office for "[t]he names of Long Beach police officers involved in the December 12[, 2010,] office[r-]involved shooting in the 5300 block of East Ocean Boulevard" (the Zerby shooting), as well as "[t]he names of Long Beach police officers involved in officer[-]involved shootings from Jan[uary] 1[,] 2005 to Dec[ember] 11, 2010" (the nearly six-year period leading up to the Zerby shooting). The request was made under the California Public Records Act (Gov. Code, § 6250 et seq.).

On December 30, 2010, plaintiff Long Beach Police Officers Association (the Union), the bargaining agent for all Long Beach police officers, sought injunctive relief in the superior court. Named as defendants were the City of Long Beach, the Long Beach Police Department, and its chief of police (collectively, the City). In its complaint, the Union asserted that the City had informed it that, unless prohibited by a court, the City would disclose the information sought by the Times. Accompanying the Union's request for injunctive relief was a declaration by Lieutenant Steve James, the Union's president, expressing concern that release of the officers' names could result in "threats against the well being of officers or their families," as occurred in one recent police shooting case in which release of

an officer's name led to "death threats" against the officer. James also mentioned an anonymous post on an Internet Web site, wishing that the children of an officer involved in a particular police shooting would experience Christmas without their father. James asserted that the Internet offers broad access to personal information, using only a person's name as an Internet search term.

The superior court issued a temporary restraining order prohibiting the City from disclosing to the Times the names of the officers involved in the Zerby shooting. The court then continued the case to a later date to determine whether to issue a preliminary or permanent injunction, and it allowed the Times to intervene in the action.

Defendant City supported plaintiff Union's request for injunctive relief. The City asserted that the names of the two officers involved in the December 2010 fatal shooting of Zerby were exempt from disclosure under the California Public Records Act. With respect to the names of the City's police officers involved in *earlier* shootings, the City asserted that those names, too, were likely subject to the same statutory exemptions but that its practice was to evaluate each disclosure request on a "case-by-case basis."

The City submitted a declaration by Long Beach Police Lieutenant Lloyd Cox, who was in charge of "the criminal and administrative investigations related to all Officer Involved Shootings." The declaration stated that the police department conducts an administrative investigation of every officer-involved shooting, and, if warranted, an internal criminal investigation follows. Documents resulting from these investigations are treated by the police department as personnel records that are statutorily exempt from disclosure. Cox's declaration also stated that revealing the name of an officer involved in a shooting could expose the officer and the officer's family to harassment, because the officer's home address and other personal information could easily be found using the

3

Internet. The declaration further stated that when, for example, an officer is involved in a shooting of a gang member, it is not uncommon for the gang to retaliate against the officer. Cox mentioned eight "Officer Safety Bulletins . . . about potential retaliation/threats against officers," two of which were related to shootings, and he also described graffiti in the City of Long Beach that read "Strike Kill a Cop."

In arguing against disclosure of the names of the officers involved in the Zerby shooting, the Union and the City cited Government Code section 6255, subdivision (a), which authorizes denial of a public records request when "the public interest served by not disclosing the record clearly outweighs the public interest served by disclosure of the record." The Union and the City argued that the public interest in preventing harassment, threats, or violence against officers and their families outweighed any benefit the public would gain from disclosure.

The Times moved to strike Lieutenant James's declaration (filed by the Union), but the Times did not object to the declaration of Lieutenant Cox (filed by the City).[1] The trial court struck those portions of the James declaration that mentioned (1) the general safety concerns associated with releasing the names of officers involved in shootings, (2) the death threats made against specific officers involved in past shootings, and (3) the ease with which a name can be used to gather personal information over the Internet. The trial court then denied the Union's request for a preliminary or permanent injunction, and it discharged the

---

[1] The Times contends that it was not properly served with the Cox declaration. The Times does not, however, assert that it raised that issue in the trial court, and hence the issue appears to have been forfeited. In any case, as discussed below, the trial court concluded that the facts asserted in the Cox declaration were too general and speculative to support the Union's request for injunctive relief. Therefore, any failure to properly serve the Cox declaration did not adversely affect the Times.

4

temporary restraining order.  The court ruled that none of the disclosure exemptions in the California Public Records Act protected the names of officers involved in shootings.  With respect to the potential harassment facing those officers and their families, the court considered such harassment to be speculative in the absence of a particularized showing regarding a specific officer.  Recognizing that such a showing might be made in the future, the superior court denied injunctive relief "without prejudice" to a renewed request demonstrating that "releasing the names of particular officers will create a likelihood of harm."

The Union and the City appealed, without success.  We then granted their petitions for review.[2]

## II

### A.  Statutory Law

The California Legislature in 1968, recognizing that "access to information concerning the conduct of the people's business is a fundamental and necessary right of every person in this state" (Gov. Code, § 6250), enacted the California Public Records Act, which grants access to public records held by state and local agencies (*id.*, § 6253, subd. (a)).  The act broadly defines " '[p]ublic records' " as including "any writing containing information relating to the conduct of the public's business prepared, owned, used, or retained by any state or local

---

[2]    Both the trial court and the Court of Appeal rejected the Times's legal issue that Government Code sections 6258 and 6259 set forth the exclusive means for litigating whether requested records must be disclosed and that therefore declaratory relief was inappropriate.  (See *Filarsky v. Superior Court* (2002) 28 Cal.4th 419 [holding that a *city* is not entitled to declaratory relief regarding its disclosure obligations under the California Public Records Act, but not deciding whether a *third party* — such as the Union here — is entitled to such relief].)  We did not grant review to decide that legal issue, and we express no view on the matter.  The issue remains open, and the Times can reassert it in any future proceedings.

agency . . . ." (*Id.*, § 6252, subd. (e).)  The act has certain specific exemptions (*id.*, §§ 6254-6254.30), but a public entity claiming an exemption must show that the requested information falls within the exemption (*id.*, § 6255, subd. (a)).

Government Code section 6255's subdivision (a) contains a "catchall exemption." (*Michaelis, Montanari & Johnson v. Superior Court* (2006) 38 Cal.4th 1065, 1071.)  It allows a public agency to "justify withholding any record by demonstrating that . . . on the facts of the particular case the public interest served by not disclosing the record clearly outweighs the public interest served by disclosure of the record." (Gov. Code, § 6255, subd. (a).)  As we have said in the past, "this provision contemplates a case-by-case balancing process, with the burden of proof on the proponent of nondisclosure to demonstrate a clear overbalance on the side of confidentiality." (*Michaelis, Montanari & Johnson*, *supra*, at p. 1071.)

Also relevant here is Government Code section 6254, subdivision (c), which protects "[p]ersonnel, medical, or similar files, the disclosure of which would constitute an unwarranted invasion of personal privacy."  But the Union and the City place their greatest reliance on Government Code section 6254, subdivision (k).  That provision protects "[r]ecords, the disclosure of which is exempted or prohibited pursuant to federal or state law, including, but not limited to, provisions of the Evidence Code relating to privilege."  Succinctly put, subdivision (k) " 'incorporates other [disclosure] prohibitions established by law.' " (*Copley Press, Inc. v. Superior Court* (2006) 39 Cal.4th 1272, 1283 (*Copley*), quoting *CBS, Inc. v. Block* (1986) 42 Cal.3d 646, 656.)  The "prohibitions" pertinent here are those set forth in a set of discovery statutes that the Legislature enacted in 1978 in response to our 1974 decision in *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*).

In *Pitchess*, a defendant charged with battery on four sheriff's deputies (Pen. Code, §§ 242, 243, subd. (b)) claimed he was defending himself against the deputies' use of excessive force. We held that defendants in similar situations had a right, albeit limited, to discover from a peace officer's employer the existence of any previous complaints about the officer's use of excessive force. (*Pitchess*, *supra*, 11 Cal.3d at pp. 537-538.) In response to our decision, the Legislature enacted several statutes, which we hereafter refer to as the "*Pitchess* statutes" and which we summarize below.

Under the *Pitchess* statutes, a public entity that employs peace officers must investigate and retain citizen complaints of any officer misconduct, such as the use of excessive force. (Pen. Code, § 832.5.) Litigants, upon a showing of good cause, are given limited access to records of such complaints and investigations (Evid. Code, §§ 1043, 1045), but such records are otherwise "confidential" and may "not be disclosed" (Pen. Code, §§ 832.7, subd. (a), 832.8, subd. (e)). Also protected as "confidential" are "[p]eace officer . . . personnel records" and "information obtained from these records." (*Id*., § 832.7, subd. (a).) Such "personnel records" include an officer's personal and family information, medical history, election of benefits (*id*., § 832.8, subds. (a), (b) & (c)), as well as matters related to the officer's "advancement, appraisal, or discipline" (*id*., subd. (d)). In addition, confidentiality applies to any information that "would constitute an unwarranted invasion of [a peace officer's] personal privacy." (*Id*., § 832.8, subd. (f).)

One other piece of legislation merits mention here. In 2004, California's voters passed an initiative measure that added to the state Constitution a provision directing the courts to broadly construe statutes that grant public access to government information and to narrowly construe statutes that limit such access. (Cal. Const., art. I, § 3, subd. (b)(2).) That provision, however, does not affect the

7

construction of any statute "to the extent . . . it protects [the] right to privacy, including any statutory procedures governing discovery or disclosure of information concerning the official performance or professional qualifications of a peace officer."  (Cal. Const., art. I, § 3, subd. (b)(3).)  Thus, by its express terms, the constitutional provision excludes from the requirement of narrow construction those statutes that protect the privacy interests of peace officers, including Government Code section 6254's subdivision (c) and the *Pitchess* statutes, both of which are at issue here.

### B.  Decisional Law

Relevant here are two of this court's recent decisions, which considered the interplay between the *Pitchess* statutes and requests under the California Public Records Act for disclosure of peace officers' names.

In *Copley*, *supra*, 39 Cal.4th 1272 (decided in 2006), a newspaper publisher sought access to a civil service commission's records of an administrative appeal brought by a county sheriff's deputy who had been terminated for disciplinary reasons.  After the commission denied the request, the publisher unsuccessfully petitioned the superior court for a writ of mandate, seeking to compel disclosure. The publisher then appealed, and the Court of Appeal directed the civil service commission to give the publisher access to the records, and also to disclose the deputy's name.  The Court of Appeal reasoned that because the *Pitchess* statutes define "personnel records" as any file maintained under the officer's name *by the officer's employing agency* (Pen. Code, § 832.8) and because the civil service commission was not the officer's employing agency, the civil service commission's records did not qualify as "personnel records" protected by the *Pitchess* statutes.  At the request of two police unions that had intervened in the action, we granted review and, with one justice dissenting, reversed the Court of Appeal.

8

*Copley* held that the civil service commission's records of the deputy's appeal were confidential "personnel records" under the *Pitchess* statutes (Pen. Code, §§ 832.7, 832.8) and therefore exempt from disclosure. (*Copley*, *supra*, 39 Cal.4th at pp. 1286-1296.) *Copley* explained that neither the language nor the legislative history of the *Pitchess* statutes suggested that a peace officer's privacy rights should have less protection simply because the officer's employer uses an outside agency like the civil service commission to conduct its administrative appeals. (*Copley*, at p. 1295.) *Copley* also rejected the Court of Appeal's conclusion that *the name* of the officer who brought the appeal had to be disclosed, noting that the *Pitchess* statutes were "designed to protect, among other things, 'the identity of officers' subject to [citizen] complaints." (*Copley*, at p. 1297, quoting Pen. Code, § 832.7, subd. (a); see *Copley*, at p. 1297, quoting Pen. Code, § 832.7, subd. (c).)

*Copley* then discussed the Court of Appeal's reliance on an earlier appellate decision, *New York Times Co. v. Superior Court* (1997) 52 Cal.App.4th 97 (*New York Times*), which broadly declared that the *Pitchess* statutes do not prevent disclosure of *the names* of peace officers. (*Copley*, *supra*, 39 Cal.4th at pp. 1297-1298.) That categorical statement was made, we said, "[w]ithout any analysis," and was "simply incorrect, at least insofar as it applies to disciplinary matters like the one at issue [in *Copley*]." (*Id.* at p. 1298.) We disapproved *New York Times* to the extent that decision conflicted with our analysis in *Copley*. (*Copley*, at p. 1298.)

In 2007, just one year after *Copley*, *supra*, 39 Cal.4th 1272, we again addressed the issue of a newspaper's request, made under the California Public Records Act, for disclosure of the names of certain peace officers. In *Commission on Peace Officer Standards and Training v. Superior Court* (2007) 42 Cal.4th 278 (*Commission on Peace Officer Standards*), a newspaper sought certain

9

information about peace officers hired statewide by various California public entities during a specified 10-year period. The information was contained in a database maintained by a public agency. When the agency denied the newspaper's request, the newspaper challenged that decision in superior court, which ordered disclosure of each officer's name, the appointing agency, the date of new appointment, and, if applicable, the date of termination. The Court of Appeal reversed, but a majority of this court disagreed with the Court of Appeal. (*Id*. at p. 303.)

In *Commission on Peace Officer Standards*, the public agency that had compiled the peace officer database did not employ any of the peace officers, and therefore the entries in its database were not "personnel records" under a literal reading of the *Pitchess* statutes (Pen. Code, § 832.8 [limiting personnel records to records held in files maintained by an individual's employer]). Nonetheless, a majority of this court concluded that the information in the database would fall within the protections afforded personnel records if the information was "obtained from" personnel records maintained by the employing agencies of the peace officers in question. (*Commission on Peace Officer Standards*, *supra*, 42 Cal.4th at p. 289.) The majority further concluded, however, "that peace officer personnel records include only the types of information enumerated in [Penal Code] section 832.8" (*id*. at p. 293), and because the specific information the trial court ordered disclosed (the names of the officers, their employing agencies, and their employment dates) did not fall into any of the enumerated categories, it was not information obtained from protected personnel records (*id*., at pp. 294-299), and therefore it was subject to disclosure.

*Commission on Peace Officer Standards* next held that Government Code section 6254's subdivision (c), which is part of the California Public Records Act, also did not preclude disclosure of the information covered by the superior court's

10

order. (See *Commission on Peace Officer Standards*, *supra*, 42 Cal.4th at p. 303.) As noted (see p. 6, *ante*), that statutory provision authorizes denial of a public records request when the information sought consists of "[p]ersonnel, medical, or similar files, the disclosure of which would constitute an unwarranted invasion of personal privacy." (Gov. Code, § 6254, subd. (c).) *Commission on Peace Officer Standards* assumed for purposes of its analysis that the records at issue "may be characterized as '[p]ersonnel . . . or similar files.' " (*Commission on Peace Officer Standards*, at p. 299.) But it noted that the exemption set forth in section 6254's subdivision (c) requires a balancing of "the privacy interests of peace officers in the information at issue against the public interest in disclosure," and it further noted that the party opposing disclosure "has the burden" of showing that the records at issue fall within the exemption — a showing the agency failed to make in *Commission on Peace Officer Standards*. (*Commission on Peace Officer Standards*, at p. 299.)

Against this background of relevant statutes and court decisions, we now consider the disclosure request of the Times.

### III

The Times, citing the California Public Records Act, seeks disclosure of the names of the two Long Beach police officers involved in the December 12, 2010, fatal shooting of Zerby, as well as the names of any Long Beach officers involved in shootings occurring between January 1, 2005, and December 11, 2010. The Union and the City oppose disclosure. They rely largely on the confidentiality protections afforded peace officers under the *Pitchess* statutes, focusing in particular on Penal Code section 832.7's subdivision (a) (protecting from disclosure a peace officer's "personnel records") and Penal Code section 832.8's subdivision (d) (defining "personnel records" as including records of employee "appraisal[] or discipline").

11

The Union and the City also attach significance to the italicized language in this quote from *Commission on Peace Officer Standards*: "[T]he legislative concern [in adopting sections 832.7 and 832.8] appears to have been with *linking a named officer to the private or sensitive information listed in section 832.8. . . .* It seems unlikely that the Legislature contemplated that the identification of an individual as a peace officer, *unconnected to any of the information it defined as part of a personnel record*, would be rendered confidential by section 832.8." (*Commission on Peace Officer Standards*, *supra*, 42 Cal.4th at p. 295, italics added.)  The Union and the City contend that disclosing the names of officers involved in on-duty shootings necessarily *links* the named officers to private or sensitive information in their personnel files, information made confidential under Penal Code section 832.7's subdivision (a).  The Union and the City reason that because every on-duty shooting is routinely investigated by the employing agency, the details of every such incident (including the names of the officers involved) are "records relating to" officer "appraisal[] or discipline" (Pen. Code, § 832.8, subd. (d)), which, by definition, are confidential "personnel records" (*id*., § 832.8).  We are not persuaded.

Although the *Pitchess* statutes limit public access to personnel records (Pen. Code, § 832.7, subd. (a)), including officer names if they are *linked* to information in personnel records (*Commission on Peace Officer Standards*, *supra*, 42 Cal.4th at p. 295), many records routinely maintained by law enforcement agencies are not personnel records.  For example, the information contained in the initial incident reports of an on-duty shooting are typically not "personnel records" as that term is defined in Penal Code section 832.8.  It may be true that such shootings are routinely investigated by the employing agency, resulting eventually in some sort of officer appraisal or discipline.  But only the records *generated* in connection with that appraisal or discipline would come within the statutory

12

definition of personnel records (Pen. Code, § 832.8, subd. (d)).  We do not read the phrase "records relating to . . . [¶] . . . [¶] . . . [e]mployee . . . appraisal[] or discipline" (*ibid*.) so broadly as to include every record that might be *considered* for purposes of an officer's appraisal or discipline, for such a broad reading of the statute would sweep virtually all law enforcement records into the protected category of "personnel records" (*id*., § 832.8).

Government Code section 6254's subdivision (f) lends some support to our conclusion.  Under that statute, when a shooting by a peace officer occurs during an arrest (Gov. Code, § 6254, subd. (f)(1)) or in the course of responding to a complaint or request for assistance (*id*., § 6254, subd. (f)(2)), and when the officer's name is recorded as one of the "factual circumstances" of the incident, disclosure of the officer's name is generally required.  It thus appears that the Legislature draws a distinction between (1) records of factual information about an incident (which generally must be disclosed) and (2) records generated as part of an internal investigation of an officer in connection with the incident (which generally are confidential).  We therefore agree with this point made in a 2008 opinion by the California Attorney General:  "Generally speaking, a response to a request just for the names of officers involved in a particular incident may be provided without revealing any investigatory or disciplinary matter that may have arisen out of the incident.  Disclosure would merely communicate a statement of fact that the named officers were involved in the incident.  It would not imply any judgment that the actions taken were inappropriate or even suspect."  (91 Ops.Cal.Atty.Gen. 11, 16-17 (2008), fn. omitted.)  An employing agency is, of course, free to emphasize, when complying with a California Public Records Act request, that its disclosure of the names of officers involved in an incident does not imply any wrongdoing by those officers.

13

Significantly, the *Pitchess* statutes are silent as to whether the names of officers involved in shootings are protected "personnel records." (Pen. Code, § 832.8.) That silence is important because, as this court observed in *Commission on Peace Officer Standards*, the personnel records exemption is limited to the categories of information that are expressly "enumerated" in Penal Code section 832.8. (*Commission on Peace Officer Standards*, *supra*, 42 Cal.4th at p. 293.) That the Legislature did not intend to protect peace officers' identities can also be inferred from the Legislature's enactment of Penal Code section 830.10, which requires uniformed officers to display their name or identification number. That statute reflects a legislative policy that, generally, the public has a right to know the identity of an officer involved in an on-duty shooting.

Misplaced is the reliance by the Union and the City on this court's decision in *Copley*, *supra*, 39 Cal.4th 1272. There, as we noted earlier, a newspaper publisher sought records of an administrative appeal brought by a sheriff's deputy who had been terminated. This court concluded that the records (including the deputy's name) were confidential personnel records under the *Pitchess* statutes. (*Copley*, at pp. 1297-1298.) Later, in *Commission on Peace Officer Standards*, this court emphasized that the records requested in *Copley* would have "linked" the deputy's name to "private or sensitive" personnel matters, thus explaining why the name at issue in *Copley* was protected. (*Commission on Peace Officer Standards*, *supra*, 42 Cal.4th at p. 295; see *id*. at pp. 298-299.) Here, by contrast, disclosing the names of officers involved in various shootings would not imply that those shootings resulted in disciplinary action against the officers, and it would not link those names to any confidential personnel matters or other protected information.

In arguing here against disclosure of the officers' names, the Union and the City note this court's disapproval in *Copley*, *supra*, 39 Cal.4th at page 1298, of the

14

Court of Appeal's statement in *New York Times*, *supra*, 52 Cal.App.4th at page 101, that " 'an individual's name is not exempt from disclosure' " under the *Pitchess* statutes. But, as we explained in *Commission on Peace Officer Standards*, *supra*, 42 Cal.4th at page 298, this court disapproved the statement from *New York Times* only " 'insofar as it applie[d] to disciplinary matters like the one at issue' " in *Copley*. (See *Copley*, at p. 1298.) The records sought in *Copley* linked the officer's name, not just to an on-duty shooting, but to a confidential disciplinary action involving the officer, and therefore they were exempt from disclosure. (See *Commission on Peace Officer Standards*, *supra*, 42 Cal.4th at pp. 295, 298-299.) Thus, *Copley*'s disapproval of the statement from *New York Times* did not alter the latter case's core holding, generally permitting disclosure of the names of peace officers involved in on-duty shootings. (See 91 Ops.Cal.Atty.Gen. 11, 13-15 (2008) [discussing *Copley*'s effect on *New York Times*].)

Nor does Government Code section 6254's subdivision (c), which is part of the California Public Records Act, help the Union and the City in their effort to prevent disclosure of the names of officers involved in shootings. As noted (see p. 6, *ante*), that provision exempts from disclosure "[p]ersonnel . . . or similar files" if disclosure "would constitute an unwarranted invasion of personal privacy." (Gov. Code, § 6254, subd. (c).) A serious question arises as to whether the names of peace officers involved in particular law enforcement incidents can be characterized as "[p]ersonnel . . . or similar files" (*ibid*.). Moreover, when it comes to the disclosure of a peace officer's name, the public's substantial interest in the conduct of its peace officers outweighs, in most cases, the officer's personal privacy interest. As we noted in *Commission on Peace Officer Standards*: "Peace officers 'hold one of the most powerful positions in our society; our dependence on them is high and the potential for abuse of power is far from insignificant.'

15

(*City of Hemet v. Superior Court* (1995) 37 Cal.App.4th 1411, 1428.) A police officer 'possesses both the authority and the ability to exercise force. Misuse of [this] authority can result in significant deprivation of constitutional rights and personal freedoms, not to mention bodily injury and financial loss.' (*Gray v. Udevitz* (10th Cir. 1981) 656 F.2d 588, 591.)" (*Commission on Peace Officer Standards*, *supra*, 42 Cal.4th at pp. 299-300.) Thus, the public's significant interest in the conduct of its peace officers "diminishes and counterbalances" an officer's privacy interest in keeping his or her name confidential. (*Id.* at p. 299.)

In a case such as this one, which concerns officer-involved shootings, the public's interest in the conduct of its peace officers is particularly great because such shootings often lead to severe injury or death. Here, therefore, in weighing the competing interests, the balance tips strongly in favor of identity disclosure and against the personal privacy interests of the officers involved. Of course, if it is essential to protect an officer's anonymity for safety reasons or for reasons peculiar to the officer's duties — as, for example, in the case of an undercover officer — then the public interest in disclosure of the officer's name may need to give way. (See *International Federation of Professional and Technical Engineers, Local 21, AFL-CIO v. Superior Court* (2007) 42 Cal.4th 319, 337.) That determination, however, would need to be based on a particularized showing, which was not made here.

We next consider the City's assertion that Government Code section 6254's subdivision (f) permits it to withhold the names of officers involved in on-duty shootings. That provision exempts from disclosure "[r]ecords . . . of investigations conducted by . . . any state or local police agency." (*Ibid.*) The Times here is not seeking the records of any administrative or criminal investigation, so that exemption is inapplicable.

16

Finally, we consider the catchall exemption in Government Code section 6255's subdivision (a), which allows a public agency to withhold any public record if the agency shows that "on the facts of the particular case the public interest served by not disclosing the record clearly outweighs the public interest served by disclosure of the record." The catchall exemption sets forth a balancing test, and we have already concluded that, generally, the balance of interests favors disclosing the names of peace officers involved in on-duty shootings. (See pp. 14-15, *ante*.) Vague safety concerns that apply to all officers involved in shootings are insufficient to tip the balance against disclosure of officer names. As we have said in the past, "[a] mere assertion of possible endangerment does not 'clearly outweigh' the public interest in access to . . . records." (*CBS, Inc. v. Block*, *supra*, 42 Cal.3d at p. 652.)

The Union and the City assert that disclosing the names of peace officers involved in shootings could lead to harassment of those officers and their families. In rejecting that argument, the trial court found that the Union and the City had offered "no evidence" of a "specific safety concern regarding any particular officer." We agree. The declaration by Long Beach Police Lieutenant Cox (submitted by the City) described the possibility of gang retaliation against officers involved in shooting gang members, but those concerns were general in nature. The December 2010 Zerby shooting did not involve a gang member, and the Union and the City did not identify other shootings that did involve a gang member. The Cox declaration also mentioned two safety bulletins warning of "potential retaliation/threats" against officers involved in shootings, and it described graffiti that read "Strike Kill a Cop," but those vague concerns do not establish any specific danger to the officers involved in the Zerby shooting or any shooting that occurred in the six years before the Zerby shooting (see the Times's public records request, quoted at p. 2, *ante*).

17

We do not hold that the names of officers involved in shootings have to be disclosed in every case, regardless of the circumstances.  We merely conclude, as did the trial court and the Court of Appeal, that the particularized showing necessary to outweigh the public's interest in disclosure was not made *here*, where the Union and the City relied on only a few vaguely worded declarations making only general assertions about the risks officers face after a shooting.  The public records request by the Times is broadly worded and covers a wide variety of incidents.  Thus, the Union and the City sought a blanket rule preventing the disclosure of officer names *every time* an officer is involved in a shooting.  Such a rule would even prevent disclosure of the name of an officer who acted in a heroic manner that was unlikely to provoke retaliation of any kind, in which case officer safety would not be an issue.  We reject that blanket rule.

The trial court's denial of injunctive relief was without prejudice to any later evidentiary showing that disclosing a particular officer's name would compromise that officer's safety or the safety of the officer's family.  That ruling permits further litigation by the Union, and it reflects the trial court's recognition, which we share, that the public's interest in access to public records is not absolute and must be weighed against the countervailing privacy and safety interests of peace officers.  Understandable are the general safety concerns of officers who fear retaliation from angry members of the community after an officer-involved shooting, especially when the shooting results in the death of an unarmed person.  But the Legislature, whose laws we must construe, has not gone so far as to protect the names of all officers involved in such shootings.  That the Legislature generally considers it important for the public to know the identities of the officers serving the community is reflected in the statutory provision requiring a uniformed officer to display either a name or an identification number (Pen. Code, § 830.10).

**DISPOSITION**

18

We affirm the judgment of the Court of Appeal, which upheld the trial court's denial of the Union's requested injunctive relief.

KENNARD, J.*

WE CONCUR:

CANTIL-SAKAUYE, C. J.
BAXTER, J.
WERDEGAR, J.
CORRIGAN, J.
LIU, J.

---

* Retired Associate Justice of the Supreme Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

19

**DISSENTING OPINION BY CHIN, J.**

I disagree with the majority's conclusion that the City of Long Beach (the City) and the Long Beach Police Officers Association (the Union) have failed to show that the information the Los Angeles Times (the Times) has requested — the names of the officers "involved in" the December 12, 2010, shooting of Douglas Zerby and the names of all police officers "involved in" shootings from January 1, 2005, until December 11, 2010 — is exempt from disclosure under the California Public Records Act (CPRA) (Gov. Code, § 6250 et seq.).[1]  In my view, the evidence in the record of the safety threat faced by police officers identified as having been involved in a shooting establishes that the requested information is exempt from disclosure under section 6254, subdivision (c), which provides that the CPRA does not require disclosure of "[p]ersonnel, medical, or similar files, the disclosure of which would constitute an unwarranted invasion of personal privacy."  I therefore dissent.

In relying on this section, the Union acknowledges that the majority in *Commission on Peace Officer Standards and Training v. Superior Court* (2007) 42 Cal.4th 278 (*Commission on Peace Officer Standards*) held that "the privacy and safety interests of peace officers" as a group regarding the mere fact of their

---

[1]     All further unlabeled statutory references are to the Government Code.

employment "do not outweigh the public's interest in the disclosure of [that] information." (*Commission on Peace Officer Standards*, *supra*, 42 Cal.4th at p. 303.) The Union argues, however, that the "heightened safety concerns of officers who have been involved in shootings" warrant striking a different "balance" with regard to this "subgroup." In support of its argument, the Union relies on the declaration of Long Beach Police Lieutenant Lloyd Cox (Cox declaration), which states in relevant part: (1) "A number of officer involved shootings involve gang members or violent criminals"; (2) "When an officer is involved in a shooting with a gang member, it is not uncommon for the gang to retaliate against law enforcement officers"; (3) "Since late 2007, the Long Beach Police Department has issued eight Officer Safety Bulletins to the department about potential retaliation/threats against officers, two of which were directly related to shootings involving police officers. As recently as January 10, 2011, the department was notified of graffiti at 5100 Appian Way that was approximately 4 feet high and 6 inches long which read 'Strike Kill a Cop' "; and (4) "Today, in the age of the internet, knowing an individual's name can be the gateway to a world of information. Public documents are readily accessible on line and can provide anyone with the home address of an individual, including a police officer. The address of a police officer in the hands of a gang member, violent offender, or angry friend, relative, or associate of a person who was shot by a police officer is of great concern for the personal safety of both the officer and their [*sic*] family. Therefore the Long Beach Police Department insists on protecting the identity of its officers, when those officers are involved in critical incidents, including shootings, in order to ensure their safety and the safety of their families."

I agree with the Union's argument. As I explained in *Commission on Peace Officer Standards*, "in 1990, the Legislature amended subdivision (a) of [Penal Code] section 832.8 by adding [officers'] 'home addresses' to the list of

2

examples of confidential '[p]ersonal data.' (Stats. 1990, ch. 264, § 1, p. 1535.)
According to the amendment's legislative history, one of the Legislature's
purposes in adding 'home addresses' to the list was to protect officers and their
families. (Assem. Com. on Public Safety, Analysis of Sen. Bill 1985 (1989–1990
Reg. Sess.) as amended May, 16, 1990, p. 2.) Given that publicly available
databases on the Internet make it easy to link a name to an address, the release of
an officer's name would not seem to pose much, if any, less of a safety risk than
would disclosing an officer's home address. (See *Frank v. City of Akron* (6th Cir.
2002) 290 F.3d 813, 819 ['Most individuals' addresses . . . are readily available on
the Internet'].) . . . [I]n light of the accessibility of information through the
Internet, it would be entirely 'feasible' for someone hostile toward the police to
use the list of names to locate peace officers' addresses in order to 'harass them'
or their families. [Citation.] Moreover, in light of the Legislature's
acknowledgment of the dangers faced by officers and their families, . . . we
[cannot] simply dismiss this threat as being 'purely speculative.' (See *King
County v. Sheehan* [(2002) 114 Wash.App. 325, 340] [it is 'naïve . . . to believe
that police officers who are identified on anti-police web sites . . . by name and
home address . . . could not thereby be placed in danger or subjected to
harassment'].)" (*Commission on Peace Officer Standards*, *supra*, 42 Cal.4th at p.
317 (dis. opn. of Chin, J.).) The evidence in the record here amply supports this
analysis.

Nothing in the majority's brief discussion of section 6254, subdivision (c),
convinces me otherwise. The majority first asserts that there is a "serious
question" as "to whether the names of peace officers involved in particular law
enforcement incidents can be characterized as '[p]ersonnel . . . or similar files' "
within the meaning of section 6254, subdivision (c). (Maj. opn., *ante*, at p. 14.)
However, for reasons I have explained in a previous case, I have no trouble

3

concluding that the names of officers who have been involved in a shooting constitute "personnel . . . or similar files" under section 6254, subdivision (c). (See *International Federation of Professional and Technical Engineers, Local 21, AFL-CIO v. Superior Court* (2007) 42 Cal.4th 319, 350-351 (conc. & dis. opn. of Chin, J.) (*International Federation*).)

The majority then moves on to its primary focus: the public's interest. Relying on *Commission on Peace Officer Standards*, the majority first identifies the public's interest generally in "the conduct of its peace officers" — specifically, the " '[m]isuse' " of their authority — and asserts that, "when it comes to the disclosure of a peace officer's name," this interest "outweighs, in most cases, the officer's personal privacy interest." (Maj. opn., *ante*, at p. 14.) The majority next asserts that this general public interest "is particularly great" in connection with "officer-involved shootings" because "such shootings often lead to severe injury or death." (Maj. opn., *ante*, at p. 15.) This heightened public interest, the majority states, "tips" the balance here "strongly in favor of identity disclosure." (*Id.* at p. 15.)

The majority's discussion is unpersuasive for several reasons. First, the majority fails to explain how disclosing the name of an officer who has in any way been "involved in officer involved shootings" — which is what the Times seeks — provides any information about whether the involved officers " '[m]isuse[d]' " their authority. (Maj. opn., *ante*, at p. 14.) Thus, merely knowing which officers were "involved in officer involved shootings" does little, if anything, to advance the public's interest in "the conduct of its peace officers." (Maj. opn., *ante*, at p. 14.)

Second, the majority's assessment of the public's interest is inconsistent with the Legislature's and the voters' view of that interest. Through the *Pitchess* statutes (see maj. opn., *ante*, at pp. 6-7), the Legislature has precluded the general

public from obtaining "[p]eace officer . . . personnel records" or "information obtained from these records." (Pen. Code, § 832.7, subd. (a).) It has specified that this restriction protects records "relating to" (1) an officer's "advancement, appraisal, or discipline" (*id*., § 832.8, subd. (d)), and (2) "[c]omplaints, or investigations of complaints, concerning an event or transaction in which [an officer] participated, or which he or she perceived, and pertaining to the manner in which he or she performed his or her duties" (*id*., § 832.8, subd. (e)). It has authorized law enforcement agencies to "disseminate data regarding the number, type, or disposition of complaints . . . made against [their] officers" *only* "if that information is in a form which does not identify the individuals involved." (*Id*., § 832.7, subd. (c).) These provisions clearly express *the Legislature's* view regarding the public's interest in discovering whether particular officers have misused their power or even have been the subject of complaints about their conduct. The voters have ratified the Legislature's view by passing a constitutional provision that expressly preserves "statutory procedures governing discovery or disclosure of information concerning the official performance or professional qualifications of a peace officer." (Cal. Const., art. I, § 3, subd. (b)(3).) The majority improperly ignores these expressions of policy by the Legislature and the voters, and improperly substitutes its own view of policy. As a court, we have neither prerogative nor power "to substitute our public policy judgment" for that of the Legislature and the voters. (*Thomas v. City of Richmond* (1995) 9 Cal.4th 1154, 1165.)

The majority errs in asserting that Penal Code section 830.10 "reflects a legislative policy that, generally, the public has a right to know the identity of an officer involved in an on-duty shooting." (Maj. opn., *ante*, at p. 13.) That section provides: "Any uniformed peace officer shall wear a badge, nameplate, or other device which bears clearly on its face the identification number or name of the

5

officer." (Pen. Code, § 830.10.) On its face, the section applies only to "uniformed" officers. (*Ibid.*) Thus, to the extent it has any relevance to officers who are *not* in uniform, it indicates a legislative intent to protect their identities. Even as to uniformed officers, it fails to support the majority's broad conclusion that the public, "generally," has a right to know the identity of officers involved in shootings. (Maj. opn., *ante*, at p. 13.) Under the section, police departments may choose not to require their uniformed officers to display their names, and may instead require them only to display their "identification number[s]." (Pen. Code, § 830.10.) Even were the statute to require officers to display their names, a statute affording the immediate participants in a police encounter access to the officers' names does not reflect a far broader legislative policy that, "generally, the public has a right to know the identity of an officer involved in an on-duty shooting." (Maj. opn., *ante*, at p. 13.) This conclusion is obvious from the fact that, as noted above, the *Pitchess* statutes allow law enforcement agencies to "disseminate data regarding the number, type, or disposition of complaints . . . made against [their] officers" *only* "if that information is in a form which does not identify the individuals involved." (Pen. Code, § 832.7, subd. (c).) In other words, the Legislature has precluded release of identifying information *generally to the public* even though the names of officers against whom complaints have been made are known to those who have filed complaints. As the majority recognized in *Commission on Peace Officer Standards,* "the mere fact that officers' names" may be displayed on their uniforms does not mean "that the information cannot be considered personal or private. (See *Department of Defense v. FLRA* (1994) 510 U.S. 487, 500 . . . ['An individual's [privacy] interest in controlling the dissemination of information regarding personal matters does not dissolve simply because that information may be available to the public in some

6

form'].)"[2] (*Commission on Peace Officer Standards*, *supra*, 42 Cal.4th at p. 296, fn. 5.)

Nor do I agree with the majority that, under section 6254, subdivision (f), "when a shooting by a peace officer occurs during an arrest [citation] or in the course of responding to a complaint or request for assistance [citation], and when the officer's name is recorded as one of the factual circumstances of the incident, disclosure of the officer's name is generally required." (Maj. opn., *ante*, at p. 12.) Section 6254, subdivision (f), generally exempts from disclosure under the CPRA "[r]ecords of complaints to, or investigations conducted by, . . . any state or local police agency." As here relevant, it further provides that, "[n]otwithstanding any other provision of this subdivision," a law enforcement agency "shall" disclose the following: (1) "the factual circumstances surrounding the arrest" of each person the agency arrests (§ 6254, subd. (f)(1); and (2) the "nature of the response" to all complaints or requests for assistance the agency receives, "including, to the extent the information regarding crimes alleged or committed or any other incident investigated is recorded, . . . the factual circumstances surrounding the crime or incident" (*id.*, subd. (f)(2)). Where one of the specified incidents involves a

---

[2] The majority cites no legislative history to support its view of the "legislative policy" Penal Code section 830.10 "reflects." (Maj. opn., *ante*, at p. 13.) The statute derives from its substantively identical predecessor, Penal Code former section 830.7, which provided: "Any uniformed peace officer shall wear a badge, nameplate, or other device which bears clearly on its face the identification number or name of such officer." (Stats. 1969, ch. 1458, § 1, p. 2978.) In the only illuminating item of legislative history I could find — a letter to the Governor urging him to sign the passed bill containing the statute — the bill's legislative author stated that it would "aid[] morale in that it goes far to halt the deindividualization of our law enforcement personnel." (Assemblyman John Miller, letter to Governor Ronald Reagan re Assem. Bill No. 1830 (1969 Reg. Sess.) Aug. 8, 1969, p. 1.) This letter does not support the majority's assertion.

7

shooting, it is not at all clear that the "factual circumstances surrounding" the incident (*id.*, subd. (f)(1), (2)) include the names of officers involved in the shooting. The majority cites, and I have found, no case supporting that view. Moreover, the language stating that these disclosure provisions apply "[n]otwithstanding any other provision of *this subdivision*" (*id.*, subd. (f), italics added) indicates that the section's disclosure requirement does not override the confidentiality provisions found in other statutes. Our courts of appeal have so construed the statute. (*County of Los Angeles v. Superior Court* (1993) 18 Cal.App.4th 588, 600 ["we cannot construe section 6254, subdivision (f), to require" disclosure of "law enforcement information" the *Pitchess* statutes make confidential].) Finally, the statute itself authorizes nondisclosure "to the extent that disclosure of a particular item of information would endanger the safety of a person involved in an investigation or would endanger the successful completion of the investigation or a related investigation." (§ 6254, subd. (f).) Because, in my view, this would include the names of officers involved in shootings, I do not agree that, even under the circumstances the majority posits, section 6254, subdivision (f), "generally require[s]" disclosure of the information the Times seeks.[3] (Maj. opn., *ante*, at p. 12.)

---

[3] The majority asserts that the disclosure exemption of section 6254, subdivision (f), does not apply because the requested information comes from a source other than "the records of any administrative or criminal investigation" of officer-involved shootings (maj. opn., *ante*, at p. 15), perhaps "the initial incident reports" of such shootings (maj. opn., *ante*, at p. 11). The appellate record offers no basis for the majority's speculation regarding the source of the requested information, as to either the Zerby shooting or any of the other officer-involved shootings that occurred during the six-year period the request identifies. Nor does the majority offer any legal basis for construing the broadly worded phrase "records *relating to* . . . [¶] . . . [¶] . . . [e]mployee . . . appraisal[] or discipline," which defines one category of confidential personnel records under Penal Code

*(footnote continued on next page)*

The majority also makes several errors in evaluating the other side of the balance:  the interests of the officers in nondisclosure.  Although relying principally on a heightened public interest in officer-involved shootings, the majority fails to consider or even acknowledge *the officer's* heightened privacy and safety interests in such cases.  In this regard, *Commission on Peace Officer Standards*, on which the majority principally relies (maj. opn., *ante*, at pp. 14-15), actually supports the Union.  There, in holding that "the typical peace officer has [no] more than an insubstantial privacy interest in the fact of his or her employment as an officer" (*Commission on Peace Officer Standards*, *supra*, 42 Cal.4th at p. 300), the majority reasoned that the fact of employment is "innocuous information" (*id.* at p. 302) because "it would not reveal [the officer's] involvement *in any particular case*" (*id*. at p. 302, fn. 12, italics added).  In this regard, the majority reasoned, disclosure of basic employment information is different from the disclosure sought in *Stone v. F.B.I.* (D.D.C. 1990) 727 F.Supp. 662 (*Stone*):  the names of FBI agents "who participated in the investigation of the assassination of Robert F. Kennedy."  (*Commission on Peace Officer Standards*, *supra*, 42 Cal.4th at p. 302, fn. 12.)  In *Stone*, " '[w]hat could reasonably be expected to constitute an unwarranted invasion of an agent's privacy is not that he or she is revealed as an FBI agent but that he or she is named as an FBI agent *who participated in the RFK investigation*.' [Citation.]"  (*Commission on Peace Officer Standards*, *supra*, at p. 302, fn. 12.)  The " 'concern is not with the

---

*(footnote continued from previous page)*
section 832.8, subdivision (d), to apply narrowly "only" to "the records *generated* in connection with" officer appraisal or discipline (maj. opn.*, ante*, at pp. 11-12). Had the Legislature intended to so limit the scope of confidentiality under this section, it easily could have used the majority's far narrower phrase.

9

identifying information *per se*, but with the connection between such information and some other detail — a statement, an event, or otherwise — which the individual would not wish to be publicly disclosed.' " (*Ibid.*, quoting *Halloran v. Veterans Admin.* (5th Cir. 1989) 874 F.2d 315, 321.) Here, the information the Times seeks *would* reveal the participation of the named officers in "particular case[s]" and *would* reveal their connection to an event — a shooting — they may " 'not wish to be publicly disclosed.' " (*Commission on Peace Officer Standards*, *supra*, at p. 302, fn. 12.) As the majority opinion in *Commission on Peace Officer Standards* establishes, the officers therefore have a heightened privacy interest in nondisclosure. Moreover, the potentially incendiary nature of the information the Times seeks — an officer's involvement in a shooting — further heightens an officer's already elevated privacy interest in not being linked to "particular case[s]." (*Ibid.*) The majority errs in failing even to acknowledge this heighted interest.

Finally, the majority's conclusion that the Union's claim under section 6254, subdivision (c), fails for lack of a "particularized showing" regarding the need for confidentiality (maj. opn., *ante*, at p. 15) is both erroneous and inconsistent with our prior decisions. The majority acknowledges both the existence and validity of the "safety concerns of officers who fear retaliation from angry members of the community after an officer-involved shooting." (Maj. opn., *ante*, at p. 17.) It also acknowledges that *the record contains evidence* of " 'potential retaliation/threats' against officers involved in shootings." (Maj. opn., *ante*, at p. 16.) However, the majority finds this evidence too "vague" and insists that more is required; as to each officer whose name is to be withheld, there must be evidence to "establish" a "specific danger" to the officer or to the members of the officer's family. (Maj. opn., *ante*, at p. 16.)

10

The specificity of proof the majority demands is inconsistent with our decision in *Times Mirror Co. v. Superior Court* (1991) 53 Cal.3d 1325 (*Times Mirror*).  There, we held that, because of safety concerns, the Governor of California had properly refused to disclose his daily, weekly, and monthly appointment calendars and schedules.  (*Id.* at pp. 1329, 1346-1347.)  The only evidence supporting our conclusion was the declaration of the Governor's security director, which stated in the most general terms that disclosing this information " 'would seriously impair [his] . . . ability to assure the Governor's security, and would constitute *a potential threat* to the Governor's safety, because the information . . . will enable the reader to know in advance and with relative precision when and where the Governor may be found, those persons who will be with him, and when he will be alone.' "  (*Id.* at p. 1346, italics added.)  Based on this evidence of a " 'potential threat to the Governor's safety' " (*ibid.*), and without requiring evidence of a particular or "specific" threat (maj. opn., *ante*, at p. 16), we concluded that, even as to "outdated calendars and schedules," nondisclosure was justified because "it is plausible to believe that an individual intent on doing harm [to the Governor] could use such information to discern activity patterns of the Governor and identify areas of particular vulnerability."  (*Times Mirror*, *supra*, at p. 1346.)  Here, based on the Cox declaration, it is plausible to believe there are individuals, intent on doing harm to police officers in retaliation for their involvement in a shooting, who could use the requested information to exact revenge on the officers or members of their families.  The "showing" in this case regarding safety concerns is certainly no more "vague," and

11

is at least as, if not more, "particularized" (maj. opn., *ante*, at p. 15), than the showing we found sufficient in *Times Mirror*.[4]

The majority does not contend otherwise or explain why *Times Mirror* is inapplicable. Instead, in applying a different and far stricter standard, it simply ignores *Times Mirror*. It fails to explain why police officers and their family members are entitled to less protection than the Governor. Surely, their lives are not worth less. Nor is it less "plausible to believe" there are "individual[s] intent on doing harm" to police officers involved in shootings than it is to believe there are "individual[s] intent on doing harm" to the Governor. (*Times Mirror*, *supra*, 53 Cal.3d at p. 1346.) On the contrary, as already noted, the majority acknowledges both the existence and validity of the "safety concerns of officers who fear retaliation from angry members of the community after an officer-involved shooting." (Maj. opn., *ante*, at p. 17.)

Contrary to the majority's suggestion (maj. opn., *ante*, at pp. 14-15), *Commission on Peace Officer Standards* and *International Federation* are consistent with, and supportive of, this analysis. In neither case was there any *evidence* submitted regarding the alleged safety concerns, a circumstance the court stressed in refusing to apply a disclosure exemption. (*Commission on Peace Officer Standards*, *supra*, 42 Cal.4th at p. 302; *International Federation*, *supra*, 42

---

[4]      Moreover, although there is a *greater* showing in this case regarding safety than in *Times Mirror*, the showing needed to justify nondisclosure here arguably *is less than* the showing that was needed in *Times Mirror*. Nondisclosure is proper under section 6254, subdivision (c), upon a showing that disclosure "would constitute an unwarranted invasion of personal privacy." In *Times Mirror*, we held that nondisclosure was proper under section 6255, which requires a showing that "on the facts of the particular case the public interest served by not disclosing the record *clearly outweighs* the public interest served by disclosure of the record." (Italics added; see *Times Mirror*, *supra*, 53 Cal.3d at pp. 1346-1347.)

12

Cal.4th at pp. 337-338.)  Notably, after stating that " ' [a] mere assertion of possible endangerment' is insufficient to justify nondisclosure," the majority in *Commission on Peace Officer Standards* cited *Times Mirror* as a case in which disclosure *was* justified because *the evidence* — the "declaration of [the] Governor's security director" — "supported [the] conclusion that release of his schedules would present a potential security threat." (*Commission on Peace Officer Standards*, *supra*, at p. 302.)  As earlier explained, here, even more than in *Times Mirror*, *evidence* regarding the dangers of disclosure was submitted. Moreover, in *Commission on Peace Officer Standards*, the majority held that, on remand, nondisclosure as to officers in certain "categories" could be justified "because the safety or efficacy of" officers in those categories "would be jeopardized by disclosure." (*Commission on Peace Officer Standards*, *supra*, 42 Cal.4th at p. 284.)  The majority in *Commission on Peace Officer Standards* identified one such category:  officers "operating undercover." (*Id.* at p. 301.) The Times's broad request for the names of all officers "involved in" shootings from January 1, 2005, until December 11, 2010, surely includes such officers. Moreover, the evidence in the record here establishes another category of officers whose safety would be jeopardized by disclosure:  those who have been involved in a shooting.

Contrary to the majority's suggestion, there is no basis for excluding from this category officers who, in using their weapons, "acted in a heroic manner that was unlikely to provoke retaliation." (Maj. opn., *ante*, at p. 16.)  The majority asserts that safety is not "an issue" for such officers. (Maj. opn., *ante*, at p. 16.) But the majority fails to explain how to distinguish between heroic acts that are likely to provoke retaliation and those that are not.  And it is naïve to believe that the desire for revenge of friends, family members, and gang associates of those shot by police will be reduced, much less eliminated, by the fact that the officers

13

acted heroically. Indeed, the majority's bald assertion will surely come as surprising news to the many officers who, having heroically used their weapons in confronting gang-related crime, face retaliation from other gang members. It simply is not true, as the majority asserts, that officer safety is "not . . . an issue" whenever a shooting may be characterized as "heroic" and "unlikely to provoke retaliation." (Maj. opn., *ante*, at p. 16.) Of course, as to individual officers who do not perceive a safety threat to themselves or their families, and who do not oppose public recognition of their heroism, section 6254, subdivision (c), would not prevent disclosure. Releasing an officer's name under those circumstances would not constitute "an unwarranted invasion of personal privacy." (*Ibid.*)

Finally, there are good reasons for not requiring, as to each officer whose name is to be withheld, evidence of an actual and specific threat to the officer or the members of his or her family. Where, as here, the disclosure request covers all officer-involved shootings during a six-year period, requiring such individualized proof will impose an obvious and substantial burden on law enforcement agencies that want to protect their officers.[5] More importantly, as the Union observes, "killers do not usually announce their intentions in advance." Thus, in most cases, although the threat to officer safety is real, the kind of evidence the majority demands is not available. Because the lives of our officers and their families are at stake, I would not require a law enforcement agency to wait until there is a specific threat — or worse, an actual attack — before allowing it to withhold

---

[5] For example, according to reported statistics, the Los Angeles Police Department averaged 70 officer-involved shootings per year for the years 2005-2008. (L.A. Police Dept., Use of Force Annual Report, p. 16 <http://www.lapdonline.org/assets/pdf/2009YearEndReportFinal.pdf> as of May 29, 2014.) In 42 officer-involved shootings internally reviewed in 2009 for compliance with department policy, "[t]here were 278 substantially involved officers," 85 of whom "discharged their firearms." (*Id.* at p. 19.)

14

information that puts its officers and their families at risk.  Absent a showing of some greater public need for the information, we should allow law enforcement agencies to protect the very officers who are out there every day protecting us. They deserve at least that much for their brave service.

I therefore dissent.[6]

**CHIN, J.**

---

[6]     Given my conclusion, I do not further address the majority's analysis regarding the applicability of the exemptions set forth in Government Code section 6255 and Penal Code sections 832.7 and 832.8.

*See last page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** Long Beach Police Officers Association v. City of Long Beach
_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX  203 Cal.App.4th 292
**Rehearing Granted**

_____

**Opinion No.** S200872
**Date Filed:** May 29, 2014
_____

**Court:** Superior
**County:** Los Angeles
**Judge:** Patrick T. Madden

_____

**Counsel:**

Law Offices of James E. Trott, James E. Trott and Larry J. Roberts for Plaintiff and Appellant.

The Law Offices of Charles Goldwasser, Charles A. Goldwasser, David A. Goldwasser and Theodore H. Dokko for Association of Orange County Deputy Sheriffs, Santa Ana Police Officers Association and Santa Barbara Police Officers Association as Amici Curiae on behalf of Plaintiff and Appellant.

Crabbe, Brown & James, Larry H. James and Christina L. Corl for The National Fraternal Order of Police as Amicus Curiae on behalf of Plaintiff and Appellant.

Bobbitt, Pinckard & Fields, Richard L. Pinckard and Charles B. Walker for Police Officers Research Association of California as Amicus Curiae on behalf of Plaintiff and Appellant.

Stone Busailah, Michael P. Stone, Muna Busailah and Robert Rabe for Los Angeles Police Protective League and Riverside Sheriffs' Association, Legal Defense Trust as Amici Curiae on behalf of Plaintiff and Appellant.

Robert E. Shannon, City Attorney, and Christina L. Checel, Deputy City Attorney, for Defendants and Appellants.

Liebert Cassidy Whitmore, Richard M. Kreisler and David A. Urban for Los Angeles County Police Chiefs' Association as Amicus Curiae on behalf of Defendants and Appellants.

Karlene W. Goller; Davis Wright Tremaine, Kelli L. Sager, Rochelle L. Wilcox and Jeff Glasser for Real Party in Interest and Respondent.

Peter Bibring; Michael T. Risher; and David Blair-Loy for ACLU Foundation of Southern California, ACLU Foundation of Northern California and ACLU Foundation of San Diego & Imperial Counties as Amici Curiae on behalf of Real Party in Interest and Respondent.

**Page 2 – S200872 – counsel continued**

**Counsel:**

Sheppard, Mullin, Richter & Hampton and Guylyn R. Cummins for California Newspaper Publishers Association, California Broadcasters Association, Newspaper Association of America, National Press Photographers Association, Associated Press, CBS Broadcasting, Inc., Freedom Communications, Inc., Gannett Co., Inc., Hearst Corporation, The New York Times Company, Press Democrat, The Press-Enterprise, San Diego Union-Tribune, The McClatchy Company, First Amendment Coalition, First Amendment Project, Californians Aware, Citizen Media Law Project, the Reporters Committee for Freedom of the Press and Newspaper Guild as Amici Curiae on behalf of Real Party in Interest and Respondent.

Levine Sullivan Koch & Schulz, James E. Grossberg, Lee Levine, Jeanette Melendez Bead; Terry Francke; Mark Powers; James Ewert; Mark H. Jackson, Jason P. Conti, Gail C. Gove; David M. Giles; Peter Scheer; Eve B. Burton, Jonathan R. Donnellan; Karole Morgan-Prager, Stephen J. Burns; Denise Leary, Ashley Messenger; Mickey H. Osterreicher; Amanda M. Leith; Covington & Burling, Kurt Wimmer; Bruce D. Brown, Gregg P. Leslie and Mark R. Caramanica for Californians Aware, California Broadcasters Association, California Newspaper Publishers Association, Dow Jones & Company, Inc., The E.W. Scripps Company, First Amendment Coalition, Hearst Corporation, The McClatchy Company, National Press Photographers Association, National Public Radio, Inc. NBCUniversal Media, LLC, Newspaper Association of America and the Reporters Committee for Freedom of the Press as Amici Curiae on behalf of Real Party in Interest and Respondent.

2

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

James E. Trott
Law Offices of James E. Trott
19665 Surfbreaker Lane
Huntington Beach, CA  92648
(714) 596-8995

Christina L. Checel
Deputy City Attorney
333 West Ocean Boulevard, 11th Floor
Long Beach, CA  90802
(562) 570-2200

David A. Urban
Liebert Cassidy Whitmore
6033 W. Century Boulevard, Suite 500
Los Angeles, CA  90045
(310) 981-2000

Kelli L. Sager
Davis Wright Tremaine
865 S. Figueroa Street ,Suite 2400
Los Angeles, CA  90017-2566
(213) 633-6800