Filed 8/29/16

# IN THE SUPREME COURT OF CALIFORNIA

DEPARTMENT OF FINANCE et al., )
)
    Plaintiffs and Respondents, )
)            S214855
    v. )
)      Ct.App. 2/1 B237153
COMMISSION ON STATE MANDATES, )
)    Los Angeles County
    Defendant and Respondent; )  Super. Ct. No. BS130730
)
)
COUNTY OF LOS ANGELES et al., )
)
    Real Parties in Interest )
    and Appellants. )
_____ )

Under our state Constitution, if the Legislature or a state agency requires a local government to provide a new program or higher level of service, the local government is entitled to reimbursement from the state for the associated costs. (Cal. Const., art. XIII B, § 6, subd. (a).) There are exceptions, however. Under one of them, if the new program or increased service is mandated by a federal law or regulation, reimbursement is not required. (Gov. Code, § 17556, subd. (c).)

The services in question here are provided by local agencies that operate storm drain systems pursuant to a state-issued permit. Conditions in that permit are designed to maintain the quality of California's water, and to comply with the federal Clean Water Act. The Court of Appeal held that certain permit conditions

SEE CONCURRING AND DISSENTING OPINION

were federally mandated, and thus not reimbursable.  We reverse, concluding that no federal law or regulation imposed the conditions nor did the federal regulatory system require the state to impose them.  Instead, the permit conditions were imposed as a result of the state's discretionary action.

## I.     BACKGROUND

The Regional Water Quality Control Board, Los Angeles Region (the Regional Board) is a state agency.  It issued a permit authorizing Los Angeles County, the Los Angeles County Flood Control District, and 84 cities (collectively, the Operators) to operate storm drainage systems.[1]  Permit conditions required that the Operators take various steps to reduce the discharge of waste and pollutants into state waters.  The conditions included installing and maintaining trash receptacles at transit stops, as wells as inspecting certain commercial and industrial facilities and construction sites.

Some Operators sought reimbursement for the cost of satisfying the conditions.  The Commission on State Mandates (the Commission) concluded

---

[1]     The cities involved are the Cities of Agoura Hills, Alhambra, Arcadia, Artesia, Azusa, Baldwin Park, Bell, Bellflower, Bell Gardens, Beverly Hills, Bradbury, Burbank, Calabasas, Carson, Cerritos, Claremont, Commerce, Compton, Covina, Cudahy, Culver City, Diamond Bar, Downey, Duarte, El Monte, El Segundo, Gardena, Glendale, Glendora, Hawaiian Gardens, Hawthorne, Hermosa Beach, Hidden Hills, Huntington Park, Industry, Inglewood, Irwindale, La Cañada Flintridge, La Habra Heights, Lakewood, La Mirada, La Puente, La Verne, Lawndale, Lomita, Los Angeles, Lynwood, Malibu, Manhattan Beach, Maywood, Monrovia, Montebello, Monterey Park, Norwalk, Palos Verdes Estates, Paramount, Pasadena, Pico Rivera, Pomona, Rancho Palos Verdes, Redondo Beach, Rolling Hills, Rolling Hills Estates, Rosemead, San Dimas, San Fernando, San Gabriel, San Marino, Santa Clarita, Santa Fe Springs, Santa Monica, Sierra Madre, Signal Hill, South El Monte, South Gate, South Pasadena, Temple City, Torrance, Vernon, Walnut, West Covina, West Hollywood, Westlake Village, and Whittier.

each required condition was a new program or higher level of service, mandated by the state rather than by federal law. However, it found the Operators were only entitled to state reimbursement for the costs of the trash receptacle condition, because they could levy fees to cover the costs of the required inspections. (See discussion, *post*, at p. 12.) The trial court and the Court of Appeal disagreed, finding that all of the requirements were federally mandated.

We granted review. To resolve this issue, it is necessary to consider both the permitting system and the reimbursement obligation in some detail.

## A. The Permitting System

The Operators' municipal storm sewer systems discharge both waste and pollutants.[2] State law controls "waste" discharges. (Wat. Code, § 13265.) Federal law regulates discharges of "pollutant[s]." (33 U.S.C. § 1311(a).) Both state and later-enacted federal law require a permit to operate such systems.

California's Porter-Cologne Water Quality Control Act (Porter-Cologne Act or the Act; Wat. Code, § 13000 et seq.) was enacted in 1969. It established the State Water Resources Control Board (State Board), along with nine regional water quality control boards, and gave those agencies "primary responsibility for the coordination and control of water quality." (Wat. Code, § 13001; see *City of Burbank v. State Water Resources Control Bd.* (2005) 35 Cal.4th 613, 619 (*City of Burbank*).) The State Board establishes statewide policy. The regional boards

---

[2]    The systems at issue here are "municipal separate storm sewer systems," sometimes referred to by the acronym "MS4." (40 C.F.R. § 122.26(b)(19) (2001).) A "municipal separate storm sewer" is a system owned or operated by a public agency with jurisdiction over disposal of waste and designed or used for collecting or conveying storm water. (40 C.F.R. § 122.26(b)(8) (2001).) Unless otherwise indicated, all further citations to the Code of Federal Regulations are to the 2001 version.

formulate and adopt water quality control plans and issue permits governing the discharge of waste. (*Building Industry Assn. of San Diego County v. State Water Resources Control Bd.* (2004) 124 Cal.App.4th 866, 875 (*Building Industry*).)

The Porter-Cologne Act requires any person discharging, or proposing to discharge, waste that could affect the quality of state waters to file a report with the appropriate regional board. (Wat. Code, § 13260, subd. (a)(1).) The regional board then "shall prescribe requirements as to the nature" of the discharge, implementing any applicable water quality control plans. (Wat. Code, § 13263, subd. (a).) The Operators must follow all requirements set by the Regional Board. (Wat. Code, §§ 13264, 13265.)

The federal Clean Water Act (the CWA; 33 U.S.C. § 1251 et seq.) was enacted in 1972, and also established a permitting system. The CWA is a comprehensive water quality statute designed to restore and maintain the chemical, physical, and biological integrity of the nation's waters. (*City of Burbank*, *supra*, 35 Cal.4th at p. 620.) The CWA prohibits pollutant discharges unless they comply with: (1) a permit (see 33 U.S.C. §§ 1328, 1342, 1344); (2) established effluent limitations or standards (see 33 U.S.C. §§ 1312, 1317); or (3) established national standards of performance (see 33 U.S.C. § 1316). (33 U.S.C. § 1311(a).) The CWA allows any state to adopt and enforce its own water quality standards and limitations, so long as those standards and limitations are not "less stringent" than those in effect under the CWA. (33 U.S.C. § 1370.)

The CWA created the National Pollutant Discharge Elimination System (NPDES), authorizing the Environmental Protection Agency (EPA) to issue a permit for any pollutant discharge that will satisfy all requirements established by the CWA or the EPA Administrator. (33 U.S.C. § 1342(a)(1), (a)(2).) The federal

4

system notwithstanding, a state may administer its own permitting system if authorized by the EPA.**3** If the EPA concludes a state has adequate authority to administer its proposed program, it must grant approval (33 U.S.C. § 1342(b)) and suspend its own issuance of permits (33 U.S.C. § 1342(c)(1)).**4**

California was the first state authorized to issue its own pollutant discharge permits. (*People of St. of Cal., etc. v. Environmental Pro. Agcy.* (9th Cir. 1975) 511 F.2d 963, 970, fn. 11, revd. on other grounds in *Environmental Protection Agency v. California* (1976) 426 U.S. 200.) Shortly after the CWA's enactment, the Legislature amended the Porter-Cologne Act, adding chapter 5.5 (Wat. Code, § 13370 et seq.) to authorize state issuance of permits (Wat. Code, § 13370, subd. (c)). The Legislature explained the amendment was "in the interest of the people of the state, in order to avoid direct regulation by the federal government of persons already subject to regulation under state law pursuant to [the Porter-Cologne Act]." (*Ibid.*) The Legislature provided that Chapter 5.5 be "construed to ensure consistency" with the CWA. (Wat. Code, § 13372, subd. (a).) It directed that state and regional boards issue waste discharge requirements "ensur[ing] compliance with all applicable provisions of the [CWA] . . . *together with any more stringent effluent standards or limitations* necessary to implement water quality control plans, or for the protection of beneficial uses, or to prevent nuisance." (Wat. Code, § 13377, italics added.) To align the state and federal

---

**3** For a state to acquire permitting authority, the governor must give the EPA a "description of the program [the state] proposes to establish," and the attorney general must affirm that the laws of the state "provide adequate authority to carry out the described program." (33 U.S.C. § 1342(b).)

**4** The EPA may withdraw approval of a state's program (33 U.S.C. § 1342(c)(3)), and also retains some supervisory authority: States must inform the EPA of all permit applications received and of any action related to the consideration of a submitted application (33 U.S.C. § 1342(d)(1)).

permitting systems, the legislation provided that the term " 'waste discharge requirements' " under the Act was equivalent to the term " 'permits' " under the CWA. (Wat. Code, § 13374.) Accordingly, California's permitting system now regulates discharges under both state and federal law. (*WaterKeepers Northern California v. State Water Resources Control Bd.* (2002) 102 Cal.App.4th 1448, 1452; accord *Building Industry*, *supra*, 124 Cal.App.4th at p. 875. )

In 1987, Congress amended the CWA to clarify that a permit is required for any discharge from a municipal storm sewer system serving a population of 100,000 or more. (33 U.S.C. § 1342(p)(2)(C), (D).) Under those amendments, a permit may be issued either on a system- or jurisdiction-wide basis, must effectively prohibit non-storm water discharges into the storm sewers, and must "require controls to reduce the discharge of pollutants *to the maximum extent practicable*." (33 U.S.C. § 1342(p)(3)(B), italics added.) The phrase "maximum extent practicable" is not further defined. How that phrase is applied, and by whom, are important aspects of this case.

EPA regulations specify the information to be included in a permit application. (See 40 C.F.R. § 122.26(d)(1)(i)-(vi), (d)(2)(i)-(viii).) Among other things, an applicant must set out a proposed management program that includes management practices; control techniques; and system, design, and engineering methods to reduce the discharge of pollutants to the maximum extent practicable. (40 C.F.R. § 122.26(d)(2)(iv).) The permit-issuing agency has discretion to determine which practices, whether or not proposed by the applicant, will be imposed as conditions. (*Ibid*.)

## B. The Permit in Question

In 2001, Los Angeles County (the County), acting for all Operators, applied for a permit from the Regional Board. The board issued a permit (the Permit),

6

with conditions intended to "reduce the discharge of pollutants in storm water to the Maximum Extent Practicable" in the Operators' jurisdiction. The Permit stated that its conditions implemented *both* the Porter-Cologne Act and the CWA.

Part 4 of the Permit contains the four requirements at issue. Part 4(C) addresses commercial and industrial facilities, and required the Operators to inspect certain facilities twice during the five-year term of the Permit. Inspection requirements were set out in substantial detail.[5] Part 4(E) of the Permit addresses construction sites. It required each Operator to "implement a program to control runoff from construction activity at all construction sites within its jurisdiction," and to inspect each construction site of one acre or greater at least "once during the wet season."[6] Finally, Part 4(F) of the Permit addresses pollution from public agency activities. Among other things, it directed each Operator not otherwise regulated to "[p]lace trash receptacles at all transit stops within its jurisdiction," and to maintain them as necessary.

---

[5]    As to commercial facilities, Part 4(C)(2)(a) required each Operator to inspect each restaurant, automotive service facility, retail gasoline outlet, and automotive dealership within its jurisdiction, and to confirm that the facility employed best management practices in compliance with state law, county and municipal ordinances, a Regional Board resolution, and the Operators' storm water quality management program (SQMP). For each type of facility, the Permit set forth specific inspection tasks.

Part 4(C)(2)(b) addressed industrial facilities, requiring the Operators to inspect them and confirm that each complied with county and municipal ordinances, a Regional Board resolution, and the SQMP. The Operators also were required to inspect industrial facilities for violations of the general industrial activity stormwater permit, a statewide permit issued by the State Board that regulates discharges from industrial facilities. (See discussion, *post*, at pp. 24-25.)

[6]    Part 4(E)(4) required inspections for violations of the general construction activity stormwater permit, another statewide permit issued by the State Board. (See discussion, *post*, at pp. 24-25.)

7

### C. Local Agency Claims

#### 1. *Applicable procedures for seeking reimbursement*

As mentioned, when the Legislature or a state agency requires a local government to provide a new program or higher level of service, the state must "reimburse that local government for the costs of the program or increased level of service." (Cal. Const., art. XIII B, § 6, subd. (a) (hereafter, section 6).)[7] However, reimbursement is not required if "[t]he statute or executive order imposes a requirement that is mandated by a federal law or regulation and results in costs mandated by the federal government, unless the statute or executive order mandates costs that exceed the mandate in that federal law or regulation." (Gov. Code, § 17556, subd. (c).)

The Legislature has enacted comprehensive procedures for the resolution of reimbursement claims (Gov. Code, § 17500 et seq.) and created the Commission to adjudicate them. (Gov. Code, §§ 17525, 17551.) It also established "a test-claim procedure to expeditiously resolve disputes affecting multiple agencies." (*Kinlaw v. State of California* (1991) 54 Cal.3d 326, 331 (*Kinlaw*).)

The first reimbursement claim filed with the Commission is called a test claim. (Gov. Code, § 17521.) The Commission must hold a public hearing, at which the Department of Finance (the Department), the claimant, and any other affected department or agency may present evidence. (Gov. Code, §§ 17551, 17553.) The Commission then determines "whether a state mandate exists and, if

---

[7] " 'Costs mandated by the state' means any increased costs which a local agency or school district is required to incur . . . as a result of any statute enacted on or after January 1, 1975, or any executive order implementing any statute enacted on or after January 1, 1975, which mandates a new program or higher level of service of an existing program within the meaning of Section 6 of Article XIIIB of the California Constitution." (Gov. Code, § 17514.)

so, the amount to be reimbursed." (*Kinlaw*, *supra*, 54 Cal.3d at p. 332.) The Commission's decision is reviewable by writ of mandate. (Gov. Code, § 17559.)

### 2. *The test claims*

The County and other Operators filed test claims with the Commission, seeking reimbursement for the Permit's inspection and trash receptacle requirements. The Department, State Board, and Regional Board (collectively, the State) responded that the Operators were not entitled to reimbursement because each requirement was federally mandated.

The Department argued that the EPA had delegated its federal permitting authority to the Regional Board, which acted as an administrator for the EPA, ensuring the state's program complied with the CWA. The Department acknowledged the Regional Board had discretion to set detailed permit conditions, but urged that the challenged conditions were required for the Permit to comply with federal law.

The State and Regional Boards argued somewhat differently. They contended the CWA required the Regional Board to impose specific permit controls to reduce the discharge of pollutants to the "maximum extent practicable." Thus, when the Regional Board determined the Permit's conditions, those conditions were part of the federal mandate. The State and Regional Boards also argued that the challenged conditions were "animated" by EPA regulations. In support of the trash receptacle requirement, they relied on 40 Code of Federal Regulations part 122.26(d)(2)(iv)(A)(3).[8] In support of the inspection

---

[8] 40 Code of Federal Regulations part 122.26(d)(2)(iv)(A) provides that the proposed management plan in an operator's permit application must be based, in part, on a "description of structural and source control measures to reduce pollutants from runoff from commercial and residential areas that are discharged from the municipal storm sewer system that are to be implemented during the life

*(footnote continued on next page)*

requirements, they relied on 40 Code of Federal Regulations part

122.26(d)(2)(iv)(B)(1),[9] (C)(1),[10] and (D)(3).[11]

---

*(footnote continued from previous page)*

of the permit, accompanied with an estimate of the expected reduction of pollutant loads and a proposed schedule for implementing such controls," and that, at a minimum, that description shall include, among other things, a "description of practices for operating and maintaining public streets, roads and highways and procedures for reducing the impact on receiving waters of discharges from municipal storm sewer systems, including pollutants discharged as a result of deicing activities." (40 C.F.R. § 122.26(d)(2)(iv)(A), (A)(3).)

[9] 40 Code of Federal Regulations part 122.26(d)(2)(iv)(B) provides that the proposed management plan in an operator's permit application must be based, in part, on a "description of a program, including a schedule, to detect and remove . . . illicit discharges and improper disposal into the storm sewer," and that the proposed program shall include a "description of a program, including inspections, to implement and enforce an ordinance, orders or similar means to prevent illicit discharges to the municipal separate storm sewer system." (40 C.F.R. § 122.26(d)(2)(iv)(B), (B)(1).)

[10] 40 Code of Federal Regulations part 122.26(d)(2)(iv)(C) provides that the proposed management plan in an operator's permit application must be based, in part, on a "description of a program to monitor and control pollutants in storm water discharges to municipal systems from municipal landfills, hazardous waste treatment, disposal and recovery facilities, industrial facilities that are subject to section 313 of title III of the Superfund Amendments and Reauthorization Act of 1986 (SARA), and industrial facilities that the municipal permit applicant determines are contributing a substantial pollutant loading to the municipal storm sewer system," and that the program shall "[i]dentify priorities and procedures for inspections and establishing and implementing control measures for such discharges." (40 C.F.R. § 122.26(d)(2)(iv)(C), (C)(1).)

[11] 40 Code of Federal Regulations part 122.26(d)(2)(iv)(D) provides that the proposed management plan in an operator's permit application must be based, in part, on a "description of a program to implement and maintain structural and non-structural best management practices to reduce pollutants in storm water runoff from construction sites to the municipal storm sewer system," which shall include, a "description of procedures for identifying priorities for inspecting sites and enforcing control measures which consider the nature of the construction activity,

*(footnote continued on next page)*

10

The Operators argued the conditions were not mandated by federal law, because nothing in the CWA or in the cited federal regulations required them to install trash receptacles or perform the required site inspections.  They also submitted evidence showing that none of the challenged requirements were contained in their previous permits issued by the Regional Board, nor were they imposed on other municipal storm sewer systems by the EPA.

As to the inspection requirements, the Operators argued that state law required the *state and regional boards* to regulate discharges of waste.  This regulatory authority included the power to inspect facilities and sites.  The Regional Board had used the Permit conditions to shift those inspection responsibilities to them.  They also presented evidence that the Regional Board was required to inspect industrial facilities and construction sites for compliance with statewide permits issued by the State Board (see *ante*, p. 7, fns. 5, 6).  They urged that the Regional Board had shifted that obligation to the Operators as well.  Finally, the Operators submitted a declaration from a county employee indicating the Regional Board had offered to pay the County to inspect industrial facilities *on behalf of* the Regional Board, but revoked that offer after including the inspection requirement in the Permit.

The EPA submitted comments to the Commission indicating that the challenged permit requirements were designed to reduce the discharge of pollutants to the "maximum extent practicable."  Thus, the EPA urged the requirements fell "within the scope" of federal regulations and other EPA

---

*(footnote continued from previous page)*

topography, and the characteristics of soils and receiving water quality."  (40 C.F.R. § 122.26(d)(2)(iv)(D), (D)(3).)

11

guidance regarding storm water management programs. The Bay Area Stormwater Management Agencies Association, the League of California Cities, and the California State Association of Counties submitted comments urging that the challenged requirements were state, rather than federal, mandates.

### 3. The commission's decision

By a four-to-two vote, the Commission partially approved the test claims, concluding none of the challenged requirements were mandated by federal law. However, the Commission determined the Operators were not entitled to reimbursement for the inspection requirements because they had authority to levy fees to pay for the required inspections. Under Government Code section 17556, subdivision (d), the constitutional reimbursement requirement does not apply if the local government has the authority to levy fees or assessments sufficient to pay for the mandated program or service.

### 4. Petitions for writ of mandate

The State challenged the Commission's determination that the requirements were state mandates. By cross-petition, the County and certain cities challenged the Commission's finding that they could impose fees to pay for the inspections.

The trial court concluded that, because each requirement fell "within the maximum extent practicable standard," they were federal mandates not subject to reimbursement. It granted the State's petition and ordered the Commission to issue a new statement of decision. The court did not reach the cross-claims relating to fee authority. Certain Operators appealed.[12] The Court of Appeal

---

[12]    The appellants are County and the Cities of Artesia, Azusa, Bellflower, Beverly Hills, Carson, Commerce, Covina, Downey, Monterey Park, Norwalk, Rancho Palo Verdes, Signal Hill, Vernon, and Westlake Village.

12

affirmed, concluding as a matter of law that the trash receptacle and inspection requirements were federal mandates.

## II. DISCUSSION

### A. Standard of Review

Courts review a decision of the Commission to determine whether it is supported by substantial evidence.  (Gov. Code, § 17559.)  Ordinarily, when the scope of review in the trial court is whether the administrative decision is supported by substantial evidence, the scope of review on appeal is the same. (*County of Los Angeles v. Commission on State Mandates* (1995) 32 Cal.App.4th 805, 814 (*County of Los Angeles*).)  However, the appellate court independently reviews conclusions as to the meaning and effect of constitutional and statutory provisions.  (*City of San Jose v. State of California* (1996) 45 Cal.App.4th 1802, 1810.)  The question whether a statute or executive order imposes a mandate is a question of law.  (*Ibid*.)  Thus, we review the entire record before the Commission, which includes references to federal and state statutes and regulations, as well as evidence of other permits and the parties' obligations under those permits, and independently determine whether it supports the Commission's conclusion that the conditions here were not federal mandates.  (*Ibid*.)

### B. Analysis

The parties do not dispute here that each challenged requirement is a new program or higher level of service.  The question here is whether the requirements were mandated by a federal law or regulation.

#### 1. *The federal mandate exception*

Voters added article XIII B to the California Constitution in 1979.  Also known as the "Gann limit," it "restricts the amounts state and local governments may appropriate and spend each year from the 'proceeds of taxes.' " (*City of*

13

*Sacramento v. State of California* (1990) 50 Cal.3d 51, 58-59 (*City of Sacramento*).) "Article XIII B is to be distinguished from article XIII A, which was adopted as Proposition 13 at the June 1978 election. Article XIII A imposes a direct constitutional limit on state and local power to *adopt and levy taxes*. Articles XIII A and XIII B work in tandem, together restricting California governments' power both to levy and to spend for public purposes." (*Id*. at p. 59, fn. 1.)

The "concern which prompted the inclusion of section 6 in article XIII B was the perceived attempt by the state to enact legislation or adopt administrative orders creating programs to be administered by local agencies, thereby transferring to those agencies the fiscal responsibility for providing services which the state believed should be extended to the public." (*County of Los Angeles v. State of California* (1987) 43 Cal.3d 46, 56.) The reimbursement provision in section 6 was included in recognition of the fact "that articles XIII A and XIII B severely restrict the taxing and spending powers of local governments." (*County of San Diego v. State of California* (1997) 15 Cal.4th 68, 81 (*County of San Diego*).) The purpose of section 6 is to prevent "the state from shifting financial responsibility for carrying out governmental functions to local agencies, which are 'ill equipped' to assume increased financial responsibilities because of the taxing and spending limitations that articles XIII A and XIII B impose." (*County of San Diego*, at p. 81.) Thus, with certain exceptions, section 6 "requires the state 'to pay for any new governmental programs, or for higher levels of service under existing programs, that it imposes upon local governmental agencies.' " (*County of San Diego*, at p. 81.)

As noted, reimbursement is not required if the statute or executive order imposes "a requirement that is mandated by a federal law or regulation," unless the state mandate imposes costs that exceed the federal mandate. (Gov. Code,

§ 17556, subd. (c).)  The question here is how to apply that exception when federal law requires a local agency to obtain a permit, authorizes the state to issue the permit, and provides the state discretion in determining which conditions are necessary to achieve a general standard established by federal law, and when state law allows the imposition of conditions that exceed the federal standard.  Previous decisions of this court and the Courts of Appeal provide guidance.

In *City of Sacramento*, *supra*, 50 Cal.3d 51, this court addressed local governments' reimbursement claims for the costs of extending unemployment insurance protection to their employees.  (*Id*., at p. 59.)  Since 1935, the applicable federal law had provided powerful incentives for states to implement their own unemployment insurance programs.  Those incentives included federal subsidies and a substantial federal tax credit for all corporations in states with certified federal programs.  (*Id*. at p. 58.)  California had implemented such a program.  (*Ibid*.)  In 1976, Congressional legislation required that unemployment insurance protection be extended to local government employees.  (*Ibid*.)  If a state failed to comply with that directive, it "faced [the] loss of the federal tax credit and administrative subsidy."  (*Ibid*.)  The Legislature passed a law requiring local governments to participate in the state's unemployment insurance program.  (*Ibid*.)

Two local governments sought reimbursement for the costs of complying with that requirement.  Opposing the claims, the state argued its action was compelled by federal law.  This court agreed, reasoning that, if the state had "failed to conform its plan to new federal requirements as they arose, its businesses [would have] faced a new and serious penalty" of double taxation, which would have placed those businesses at a competitive disadvantage against businesses in states complying with federal law.  (*City of Sacramento*, *supra*, 50 Cal.3d at p. 74.)  Under those circumstances, we concluded that the "state simply did what was necessary to avoid certain and severe federal penalties upon its

15

resident businesses." (*Ibid.*) Because "[t]he alternatives were so far beyond the realm of practical reality that they left the state '*without discretion*' to depart from federal standards," we concluded "the state acted in response to a federal 'mandate.' " (*Ibid.*, italics added.)

*County of Los Angeles*, *supra*, 32 Cal.App.4th 805, involved a different kind of federal compulsion. In *Gideon v. Wainwright* (1963) 372 U.S. 335, the United States Supreme Court held that states were required by the federal Constitution to provide counsel to indigent criminal defendants. That requirement had been construed to include "the right to the use of any experts that will assist counsel in preparing a defense." (*County of Los Angeles*, at p. 814.) The Legislature enacted Penal Code section 987.9, requiring local governments to provide indigent criminal defendants with experts for the preparation of their defense. (*County of Los Angeles*, at p. 811, fn. 3.) Los Angeles County sought reimbursement for the costs of complying with the statute. The state argued the statute's requirements were mandated by federal law.

The state prevailed. The Court of Appeal reasoned that, even without Penal Code section 987.9, the county would have been "responsible for providing ancillary services" under binding Supreme Court precedent. (*County of Los Angeles*, *supra*, 32 Cal.App.4th at p. 815.) Penal Code section 987.9 merely codified an existing federal mandate. (*County of Los Angeles*, at p. 815.)

*Hayes v. Commission on State Mandates* (1992) 11 Cal.App.4th 1564 (*Hayes*) provides a contrary example. *Hayes* involved the federal Education of the Handicapped Act (EHA; 20 U.S.C. § 1401 et seq.). EHA was a "comprehensive measure designed to provide all handicapped children with basic educational opportunities." (*Hayes*, at p. 1594.) EHA required each state to adopt an implementation plan, and mandated "certain substantive and procedural

16

requirements," but left "primary responsibility for implementation to the state." (*Hayes*, at p. 1594.)

Two local governments sought reimbursement for the costs of special education assessment hearings which were required under the state's adopted plan. The state argued the requirements imposed under its plan were federally mandated. The *Hayes* court rejected that argument. Reviewing the historical development of special education law (*Hayes*, *supra*, 11 Cal.App.4th at pp. 1582-1592), the court concluded that, so far as the state was concerned, the requirements established by the EHA were federally mandated. (*Hayes*, at p. 1592.) However, that conclusion "mark[ed] the starting point rather than the end of [its] consideration." (*Ibid*.) The court explained that, in determining whether federal law requires a specified function, like the assessment hearings, the focus of the inquiry is whether the "manner of implementation of the federal program was left to the *true discretion* of the state." (*Id*. at p. 1593, italics added.) If the state "has adopted an implementing statute or regulation pursuant to the federal mandate," and had "no 'true choice' " as to the manner of implementation, the local government is not entitled to reimbursement. (*Ibid*.) If, on the other hand, "the manner of implementation of the federal program was left to the true discretion of the state," the local government might be entitled to reimbursement. (*Ibid*.)

According to the *Hayes* court, the essential question is how the costs came to be imposed upon the agency required to bear them. "If the state freely chose to impose the costs upon the local agency as a means of implementing a federal program then the costs are the result of a reimbursable state mandate regardless whether the costs were imposed upon the state by the federal government." (*Hayes*, *supra*, 11 Cal.App.4th at p. 1594.) Applying those principles, the court concluded that, to the extent "the state implemented the [EHA] by freely choosing to impose new programs or higher levels of service upon local school districts, the

17

costs of such programs or higher levels of service are state mandated and subject to" reimbursement. (*Ibid*.)

From *City of Sacramento*, *County of Los Angeles*, and *Hayes*, we distill the following principle: If federal law compels the state to impose, or itself imposes, a requirement, that requirement is a federal mandate. On the other hand, if federal law gives the state discretion whether to impose a particular implementing requirement, and the state exercises its discretion to impose the requirement by virtue of a "true choice," the requirement is not federally mandated.

*Division of Occupational Safety & Health v. State Bd. of Control* (1987) 189 Cal.App.3d 794 (*Division of Occupational Safety*) is instructive. The federal Occupational Safety and Health Act (Fed. OSHA; 29 U.S.C. § 651 et seq.) preempted states from regulating matters covered by Fed. OSHA unless a state had adopted its own plan and gained federal approval. (*Division of Occupational Safety*, at p. 803.) No state was obligated to adopt its own plan. But, if a state did so, the plan had to include standards at least as effective as Fed. OSHA's and extend those standards to state and local employees. California adopted its own plan, which was federally approved. The state then issued a regulation that, according to local fire districts, required them to maintain three-person firefighting teams. Previously, they had been permitted to maintain two-person teams. (*Division of Occupational Safety*, at pp. 798-799.) The local fire districts sought reimbursement for the increased level of service. The state opposed, arguing the requirement was mandated by federal law.

The court agreed with the fire districts. As the court explained, a Fed. OSHA regulation arguably required the maintenance of three-person firefighting teams. (*Division of Occupational Safety*, *supra*, 189 Cal.App.3d at p. 802.) However, that federal regulation specifically excluded local fire districts. (*Id*. at p. 803.) Had the state elected to be governed by *Fed. OSHA standards*, that

18

exclusion would have allowed those fire districts to maintain two-person teams. (*Division of Occupational Safety*, at p. 803.) The conditions for approval of the *state's plan* required effective enforcement and coverage of public employees. But those conditions did not make the costs of complying with the state regulation federally mandated. "[T]he decision to establish . . . a federally approved [local] plan is an option which the state exercises freely." (*Ibid.*) In other words, the state was not "*compelled* to . . . extend jurisdiction over occupational safety to local governmental employers," which would have otherwise fallen under a federal exclusion. (*Ibid.*) Because the state "was not required to promulgate [the state regulation] to comply with federal law, the exemption for federally mandated costs does not apply." (*Id.* at p. 804.)[13]

*San Diego Unified School Dist. v. Commission on State Mandates* (2004) 33 Cal.4th 859 (*San Diego Unified*) provides another example. In *Goss v. Lopez* (1975) 419 U.S. 565, the United States Supreme Court held that if a school principal chose to recommend a student for expulsion, federal due process principles required the school district to give that student a hearing. Education Code section 48918 provided for expulsion hearings. (*San Diego Unified*, at p. 868.) Under Education Code section 48915, a school principal had *discretion* to recommend expulsion under certain circumstances, but was compelled to recommend expulsion for a student who possessed a firearm. (*San Diego Unified*, at p. 869.) Federal law at the time did not require expulsion for a student who brought a gun to school. (*Id.* at p. 883.)

---

**13** In the end, the court held that the challenged state regulation did not obligate the local fire district to maintain three-person firefighting teams. Accordingly, the state regulation did not mandate an increase in costs. (*Division of Occupational Safety*, *supra*, 189 Cal.App.3d at pp. 807-808.)

19

The school district argued it was entitled to reimbursement of *all* expulsion hearing costs. This court drew a distinction between discretionary and mandatory expulsions. We concluded the costs of hearings for *discretionary* expulsions flowed from a federal mandate. (*San Diego Unified*, *supra*, 33 Cal.4th at pp. 884-890.)[14] We declined, however, to extend that rule to the costs related to *mandatory* expulsions. Because it was *state law* that required an expulsion recommendation for firearm possession, all hearing costs triggered by the mandatory expulsion provision were reimbursable state-mandated expenses. (*Id*. at pp. 881-883). As was the case in *Hayes*, the key factor was how the costs came to be imposed on the entity that was required to bear them. The school principal could avoid the cost of a federally-mandated hearing by choosing not to recommend an expulsion. But, when a state statute *required* an expulsion recommendation, the attendant hearing costs did not flow from a federal mandate. (*San Diego Unified*, *supra*, 33 Cal.4th at p. 881.)

### 2. Application

Review of the Commission's decision requires a determination as to whether federal statutory, administrative, or case law imposed, or compelled the Regional Board to impose, the challenged requirements on the Operators.

It is clear federal law did not compel the Regional Board to impose these particular requirements. There was no evidence the state was compelled to administer its *own* permitting system rather than allowing the EPA do so under the CWA. (33 U.S.C. § 1342(a).) In this respect, the case is similar to *Division of*

---

**14** To the extent Education Code section 48918 imposed requirements that went beyond the mandate of federal law, those requirements were merely incidental to the federal mandate, and at most resulted in "a de minimis cost." (*San Diego Unified*, *supra*, 33 Cal.4th at p. 890.) The State does not argue here that the costs of the challenged permit conditions were de minimis.

20

*Occupational Safety*, *supra*, 189 Cal.App.3d 794. Here, as in that case, the state chose to administer its own program, finding it was "in the interest of the people of the state, *in order to avoid direct regulation by the federal government* of persons already subject to regulation" under state law. (Wat. Code, § 13370, subd. (c), italics added.) Moreover, the Regional Board was not required by federal law to impose any specific permit conditions. The federal CWA broadly directed the board to issue permits with conditions designed to reduce pollutant discharges to the maximum extent practicable. But the EPA's regulations gave the board discretion to determine which specific controls were necessary to meet that standard. (40 C.F.R. § 122.26(d)(2)(iv).) This case is distinguishable from *City of Sacramento*, *supra*, 50 Cal.3d 51, where the state risked the loss of subsidies and tax credits for all its resident businesses if it failed to comply with federal legislation. Here, the State was not compelled by federal law to impose any particular requirement. Instead, as in *Hayes*, *supra*, 11 Cal.App.4th 1564, the Regional Board had discretion to fashion requirements which it determined would meet the CWA's maximum extent practicable standard.

The State argues the Commission failed to account for the flexibility in the CWA's regulatory scheme, which conferred discretion on the State and regional boards in deciding what conditions were necessary to comply with the CWA. In exercising that discretion, those agencies were required to rely on their scientific, technical, and experiential knowledge. Thus, the State contends the Permit itself is the best indication of what requirements *would have been imposed* by the EPA if the Regional Board had not done so, and the Commission should have deferred to the board's determination of what conditions federal law required.

We disagree that the Permit itself demonstrates what conditions would have been imposed had the EPA granted the Permit. In issuing the Permit, the Regional Board was implementing both state and federal law and was authorized to include

21

conditions more exacting than federal law required. (*City of Burbank*, *supra*, 35 Cal.4th at pp. 627-628.) It is simply not the case that, because a condition was in the Permit, it was, ipso facto, required by federal law.

We also disagree that the Commission should have deferred to the Regional Board's conclusion that the challenged requirements were federally mandated. That determination is largely a question of law. Had the Regional Board found, when imposing the disputed permit conditions, that those conditions were the only means by which the maximum extent practicable standard could be implemented, deference to the board's expertise in reaching that finding would be appropriate. The board's legal authority to administer the CWA and its technical experience in water quality control would call on sister agencies as well as courts to defer to that finding. The State, however, provides no authority for the proposition that, absent such a finding, the Commission should defer to a state agency as to whether requirements were state or federally mandated. Certainly, in a trial court action challenging the *board's authority* to impose specific permit conditions, the board's findings regarding what conditions satisfied the federal standard would be entitled to deference. (See, e.g., *City of Rancho Cucamonga v. Regional Water Quality Control Bd.* (2006) 135 Cal.App.4th 1377, 1384, citing *Fukuda v. City of Angels* (1999) 20 Cal.4th 805, 817-818.) Resolution of those questions would bring into play the particular technical expertise possessed by members of the regional board. In those circumstances, the party challenging the board's decision would have the burden of demonstrating its findings were not supported by substantial evidence or that the board otherwise abused its discretion. (*Rancho Cucamonga*, at p. 1387; *Building Industry*, *supra*, 124 Cal.App.4th at pp. 888-889.)

Reimbursement proceedings before the Commission are different. The question here was not whether the Regional Board had authority to impose the challenged requirements. It did. The narrow question here was who will pay for

22

them. In answering that legal question, the Commission applied California's constitutional, statutory, and common law to the single issue of reimbursement. In the context of these proceedings, the State has the burden to show the challenged conditions were mandated by federal law.

Section 6 establishes a general rule requiring reimbursement of all state-mandated costs. Government Code section 17556, subdivision (c), codifies an exception to that rule. Typically, the party claiming the applicability of an exception bears the burden of demonstrating that it applies. (See *Simpson Strong-Tie Co., Inc. v. Gore* (2010) 49 Cal.4th 12, 23; see also, *Long Beach Police Officers Assn. v. City of Long Beach* (2014) 59 Cal.4th 59, 67.) Here, the State must explain why federal law mandated these requirements, rather than forcing the Operators to prove the opposite. The State's proposed rule, requiring the Commission to defer to the Regional Board, would leave the Commission with no role to play on the narrow question of who must pay. Such a result would fail to honor the Legislature's intent in creating the Commission.

Moreover, the policies supporting article XIII B of the California Constitution and section 6 would be undermined if the Commission were required to defer to the Regional Board on the federal mandate question. The central purpose of article XIII B is to rein in local government spending. (*City of Sacramento*, *supra*, 50 Cal.3d at pp. 58-59.) The purpose of section 6 is to protect local governments from state attempts to impose or shift the costs of new programs or increased levels of service by entitling local governments to reimbursement. (*County of San Diego*, *supra*, 15 Cal.4th at p. 81.) Placing the burden on the state to demonstrate that a requirement is federally mandated, and thus excepted from reimbursement, serves those purposes.

Applying the standard of review described above, we evaluate the entire record and independently review the Commission's determination the challenged

23

conditions were not federal mandates.  We conclude the Commission was correct. These permit conditions were not federally mandated.

### a)        The inspection requirements

Neither the CWA's "maximum extent practicable" provision nor the EPA regulations on which the State relies expressly required the Operators to inspect these particular facilities or construction sites.  The CWA makes no mention of inspections.  (33 U.S.C. § 1342(p)(3)(B)(iii).)  The regulations required the Operators to include in their permit application a description of priorities and procedures for inspecting certain industrial facilities and construction sites, but suggested that the Operators would have discretion in selecting which facilities to inspect.  (See C.F.R. § 122.26(d)(2)(iv)(C)(1).)  The regulations do not mention commercial facility inspections at all.

Further, as the Operators explained, state law made the *Regional Board* responsible for regulating discharges of waste within its jurisdiction.  (Wat. Code, §§ 13260, 13263.)  This regulatory authority included the power to "inspect the facilities of any person to ascertain whether . . . waste discharge requirements are being complied with."  (Wat. Code, § 13267, subd. (c).)  Thus, state law imposed an overarching mandate that the Regional Board inspect the facilities and sites.

In addition, federal law and practice required the Regional Board to inspect all industrial facilities and construction sites.  Under the CWA, the State Board, as an issuer of NPDES permits, was required to issue permits for storm water discharges "associated with industrial activity."  (33 U.S.C. § 1342(p)(3)(A).)  The term "industrial activity" includes "construction activity."  (40 C.F.R. § 122.26(b)(14)(x).)  The Operators submitted evidence that the State Board had satisfied its obligation by issuing a general industrial activity stormwater permit and a general construction activity stormwater permit.  Those statewide permits

24

imposed controls designed to reduce pollutant discharges from industrial facilities and construction sites. Under the CWA, those facilities and sites could operate under the statewide permits rather than obtaining site-specific pollutant discharge permits.

The Operators showed that, in those statewide permits, the State Board had placed responsibility for inspecting facilities and sites on the *Regional Board*. The Operators submitted letters from the EPA indicating the State and regional boards were responsible for enforcing the terms of the statewide permits. The Operators also noted the State Board was authorized to charge a fee to facilities and sites that subscribed to the statewide permits (Wat. Code, § 13260, subd. (d)), and that a portion of that fee was earmarked to pay the Regional Board for "inspection and regulatory compliance issues." (Wat. Code, § 13260, subd. (d)(2)(B)(iii).) Finally, there was evidence the Regional Board offered to pay the County to inspect industrial facilities. There would have been little reason to make that offer if federal law required the County to inspect those facilities.

This record demonstrates that the Regional Board had primary responsibility for inspecting these facilities and sites. It shifted that responsibility to the Operators by imposing these Permit conditions. The reasoning of *Hayes*, *supra*, 11 Cal.App.4th 1564, provides guidance. There, the EHA required the state to provide certain services to special education students, but gave the state discretion in implementing the federal law. (*Hayes*, at p. 1594.) The state exercised its "true discretion" by selecting the specific requirements it imposed on local governments. As a result, the *Hayes* court held the costs incurred by the local governments were state-mandated costs. (*Ibid.*) Here, state and federal law required the Regional Board to conduct inspections. The Regional Board exercised its discretion under the CWA, and shifted that obligation to the Operators. That the Regional Board did so while exercising its permitting

25

authority under the CWA does not change the nature of the Regional Board's action under section 6. Under the reasoning of *Hayes*, the inspection requirements were not federal mandates.

The State argues the inspection requirements were federally mandated because the CWA required the Regional Board to impose permit controls, and the EPA regulations contemplated that some kind of operator inspections would be required. That the EPA regulations contemplated some form of inspections, however, does not mean that federal law required the scope and detail of inspections required by the Permit conditions.[15] As explained, the evidence before the Commission showed the opposite to be true.

### b) *The trash receptacle requirement*

The Commission concluded the trash receptacle requirement was not a federal mandate because neither the CWA nor the regulation cited by the State explicitly required the installation and maintenance of trash receptacles. The State contends the requirement was mandated by the CWA and by the EPA regulation that directed the Operators to include in their application a "description of practices for operating and maintaining public streets, roads and highways and procedures for reducing the impact on receiving waters of discharges from municipal storm sewer systems." (40 C.F.R. § 122.26(d)(2)(iv)(A)(3).)

The Commission's determination was supported by the record. While the Operators were required to include a description of practices and procedures in

---

[15] The State also relied on a 2008 letter from the EPA indicating that the requirements to inspect industrial facilities and construction sites fell within the maximum extent practicable standard under the CWA. That letter, however, does not indicate that federal law required municipal storm sewer system operators to inspect all industrial facilities and construction sites within their jurisdictions.

their permit application, the issuing agency has discretion whether to make those practices conditions of the permit. (40 C.F.R. § 122.26(d)(2)(iv).) No regulation cited by the State required trash receptacles at transit stops. In addition, there was evidence that the EPA had issued permits to other municipal storm sewer systems in Anchorage, Boise, Boston, Albuquerque, and Washington, D.C. that did not require trash receptacles at transit stops. The fact the EPA itself had issued permits in other cities, but did not include the trash receptacle condition, fatally undermines the argument that the requirement was federally mandated.

### c) Conclusion

Although we have upheld the Commission's determination on the federal mandate question, the State raised other arguments in its writ petition. Further, the issues presented in the Operators' cross-petition were not addressed by either the trial court or the Court of Appeal. We remand the matter so those issues can be addressed in the first instance.

### III. DISPOSITION

We reverse the judgment of the Court of Appeal and remand for further proceedings consistent with our opinion.

**CORRIGAN, J.**

**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**WERDEGAR, J.**
**CHIN, J.**

27

**CONCURRING AND DISSENTING OPINION BY CUÉLLAR, J.**

A local government is entitled to reimbursement from the state when the Legislature or a state agency requires it to provide new programs or increased service. (Cal. Const., art. XIII B, § 6, subd. (a).) But one crucial exception coexists with this rule. It applies where the new program or increased service is mandated by a federal statute or regulation. (Gov. Code, § 17556, subd. (c).) We consider in this case whether certain conditions to protect water quality included in a permit from the Regional Water Quality Board, Los Angeles Region (Regional Board or Board) — specifically, installation and maintenance of trash receptacles at transit stops, as well as inspections of certain commercial and industrial facilities and construction sites — constitute state mandates subject to reimbursement, or federal mandates within the statutory reimbursement exception.

What the majority concludes is that federal law did not compel imposition of the conditions, and that the local agencies would not necessarily have been required to comply with them had they not been imposed by the state. In doing so, the majority upholds and treats as correct a decision by the Commission on State Mandates (the Commission) that is flawed in its approach and far too parsimonious in its analysis. This is no small feat: not only must the majority discount any expertise the Regional Board might bring to bear on the mandate question (see maj. opn., *ante*, at pp. 22-24), but it must also overlook the Commission's reliance on an overly narrow analytical framework and prop up the

Commission's decision with evidence on which the agency *could have relied*, rather than that on which it did (see *id.* at pp. 24-27).

Moreover, when the majority considers whether the permit conditions are indeed federally mandated, it purports to apply de novo review to the Commission's legal determination. (See maj. opn., *ante*, at pp. 13, 22, 24.) What it actually applies seems far more deferential to the Commission's decision — something akin to substantial evidence review — despite the Commission's own failure in affording deference to the Regional Board and, more generally, its reliance on the wrong decision-making framework. (Cf. *People v. Barnwell* (2007) 41 Cal.4th 1038, 1052 ["A substantial evidence inquiry examines the record in the light most favorable to the judgment and upholds it if the record contains reasonable, credible evidence of solid value upon which a reasonable trier of fact *could* have relied in reaching the conclusion in question"].) Indeed, what the majority overlooks is that the Commission itself should have considered the effect of the evidence on which the majority now relies in deciding whether the challenged permit conditions were necessary to comply with federal law. And in doing so, the Commission should have extended a measure of deference to the Regional Board's expertise in administering the statutory scheme. (See *County of Los Angeles v. Cal. State Water Resources Control Bd.* (2006) 143 Cal.App.4th 985, 997 (*State Water Board*).)

Because the Commission failed to do so, and because the Commission's interpretation of the federal Clean Water Act (the CWA; 33 U.S.C. § 1251 et seq.) failed to account for the complexities of the statute, I would reverse the Court of Appeal's judgment and remand with instructions for the Commission to reconsider its decision. So I concur in the majority's judgment reversing the Court of Appeal, but dissent from its conclusion upholding the Commission's decision rather than remanding the matter for further proceedings.

2

## I.

To determine whether it is the state rather than local governments that should bear the entirety of the financial burden associated with a new program or increased service, the Commission must examine the nature of the federal scheme in question. That scheme is the CWA, a statute Congress amended in 1972 to establish the National Pollutant Discharge Elimination System (the NPDES) as a means of achieving and enforcing limitations on pollutant discharges. (See *EPA v. State Water Resources Control Bd.* (1976) 426 U.S. 200, 203-204.) The role envisioned for the states under the NPDES is a major one, encompassing both the opportunity to assume the primary responsibility for the implementation and enforcement of federal effluent discharge limitations by issuing permits as well as the discretion to enact requirements that are more onerous than the federal standard. (See 33 U.S.C. §§ 1251(b), 1342(b).)

But states undertaking such implementation must do so in a manner that complies with regulations promulgated by the Environmental Protection Agency (the EPA), as well as the CWA's broad provisions (including the "maximum extent practicable" standard (33 U.S.C. § 1342(p)(3)(B)(iii))), and subject to the EPA's continuing revocation authority (see *id.*, § 1342(c)(3)). Despite the breadth of the requirements the statute imposes on states assuming responsibility for permitting enforcement and the expansive nature of the EPA's revocation authority, neither the statute nor its implementing regulations include a safe harbor provision establishing a minimum level of compliance with the federal standard — an absence the majority tacitly acknowledges. (See maj. opn., *ante*, at p. 21 ["the Regional Board was not required by federal law to impose any specific permit conditions"].) Instead, implementation of the federal mandate requires the state agency — here, the Regional Board — to exercise technical judgments about the

3

feasibility of alternative permitting conditions necessary to achieve compliance with the federal statute.

With no statutory safe harbor that the Regional Board could have relied on to ensure the EPA's approval of the state permitting process, the Board interpreted the federal standard in light of the statutory text, implementing regulations, and its technical appraisal of potential alternatives. In discharging its own role, the Commission was then bound to afford the Regional Board a measure of "sister-agency" deference. (See *Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 7 [explaining that "the binding power of an agency's *interpretation* of a statute or regulation is contextual: Its power to persuade is both circumstantial and dependent on the presence or absence of factors that support the merit of the interpretation"].) In this case, the Regional Board informed localities that, in its view, the various permit conditions it imposed would satisfy the maximum extent practicable standard. The EPA agreed the requirements were within the scope of the federal standard. The Regional Board's judgment that these conditions will control pollutant discharges to the extent required by federal law is at the core of the agency's institutional expertise. That expertise merits a measure of deference because the Regional Board's ken includes not only its greater familiarity with the CWA (relative to other entities), but also technical knowledge relevant to judgments about the water quality consequences of particular permitting conditions relevant to the provisions of the CWA. (See, e.g., 33 U.S.C. § 1342(p)(3)(B)(iii) [requiring that permits include "management practices, control techniques and system, design and engineering methods, and such other provisions as . . . the State determines appropriate for the control of such pollutants"].) Casting aside the Regional Board's expertise on the issue at hand, the majority nonetheless upholds the Commission's ruling.

4

Remand to the Commission would have been the more appropriate course for multiple reasons. First, the Commission applied the wrong framework for its analysis. It failed to consider all the evidence relevant to whether the permit conditions were necessary for compliance with federal law. The commission compounded its error by relying on an interpretation of the CWA that misconstrues the federal statutory scheme governing the state permitting process.

In particular, the Commission treated the problem as essentially a simple matter of searching the statutory text and regulations for precisely the same terms used by the Regional Board's permit conditions. Unless the requirement in question is referenced explicitly in a federal statutory or regulatory provision, the Commission's analysis suggests, the requirement cannot be a federal mandate. With respect to trash receptacles, the Commission stated: "Because installing and maintaining trash receptacles at transit stops is not expressly required of cities or counties or municipal separate storm sewer dischargers in the federal statutes or regulations, these are activities that 'mandate costs that exceed the mandate in the federal law or regulation.' " And with respect to industrial facility inspections, the Commission said this: "Inasmuch as the federal regulation (40 CFR § 122.26 (c)) authorizes coverage under a statewide general permit for the inspections of industrial activities, and the federal regulation (40 CFR § 122.26 (d)(2)(iv)(D)) does not expressly require those inspections to be performed by the county or cities (or the 'owner or operator of the discharge') the Commission finds that the state has freely chosen to impose these activities on the permittees." (Fn. omitted.)

Existing law does not support this method of determining what constitutes a federal mandate. Instead, our past decisions emphasize the need to consider the implications of multiple statutory provisions and broader statutory context when interpreting federal law to determine if a given condition constitutes a federal mandate. (See *City of Sacramento v. State of California* (1990) 50 Cal.3d 51, 76

5

(*City of Sacramento*); see also *San Diego Unified School Dist. v. Commission on State Mandates* (2004) 33 Cal.4th 859, 890 ["challenged state rules or procedures that are intended to implement an applicable federal law — and whose costs are, *in context*, de minimis — should be treated as part and parcel of the underlying federal mandate" (italics added)].)  In contrast, the Commission's overly narrow approach to determining what constitutes a federal mandate risks creating a standard that will never be met so long as the state retains any shred of discretion to implement a federal program.  It cannot be that so long as a federal statute or regulation does not expressly require every permit term issued by a state agency, then the permit is a state, rather than a federal, mandate.  But this is precisely how the Commission analyzed the issue — an analysis that, remarkably, the majority does not even question.  Instead, the majority combs the record for evidence that could have supported the result the Commission reached.  In so doing, the majority implicitly acknowledges that the Commission's approach to resolving the question at the heart of this case was deficient.

But if the Commission applied the wrong framework for its analysis, the right course is to remand.  Doing so would obviate the need to cobble together scattered support for a decision by the Commission that was premised, in the first instance, on the Commission's own misconstrual of the inquiry before it.  Instead, we should give the Commission an opportunity to reevaluate its conclusion in light of the entire record and to, where appropriate, solicit further information from the parties to shed light on what permit conditions are necessary for compliance with federal law.

The potential consequences of allowing the Commission to continue on its present path are quite troubling.  For if the law were as the Commission suggests, the state would be unduly discouraged from participating in federal programs like the NPDES — even though participation might otherwise be in California's

6

interest — if the state knows ex ante that it will be unable to pass along the expenses to the local areas that experience the most costs and benefits from the mandate at issue. Our law on unfunded mandates does not compel such a result. Nor is there an apparent prudential rationale in support of it.

The Commission's approach also fails to appreciate the EPA's role in implementing (through its interpretation and enforcement of the CWA) statutory requirements that the CWA describes in relatively broad terms. Indeed, what may be "practicable" in Los Angeles may not be in San Francisco, much less in Kansas City or Detroit. (See *Building Industry Assn. of San Diego County v. State Water Resources Control Bd.* (2004) 124 Cal.App.4th 866, 889 (*Building Industry Assn.*) [explaining that "the maximum extent practicable standard is a highly flexible concept that depends on balancing numerous factors, including the particular control's technical feasibility, cost, public acceptance, regulatory compliance, and effectiveness"].) It also suggests a lack of understanding of two interrelated matters on which the Regional Board likely has expertise: the consequences of the measures included as permit conditions relative to any alternatives and the interpretation of a complex federal statute governing regulation of the environment.

Second, beyond failing to consider all the relevant evidence bearing on the necessity of the imposed permit conditions, the Commission failed to extend any meaningful deference to the Regional Board's conclusions — even though such deference was warranted given that the nature of the decisions involved in interpreting the CWA included evaluating appropriate alternatives and determining which of those were necessary to satisfy the federal standard. (See *State Water Board*, *supra*, 143 Cal.App.4th at p. 997 ["we defer to the regional board's expertise in construing language which is not clearly defined in statutes involving pollutant discharge into storm drain sewer systems"]; *City of Rancho*

7

*Cucamonga v. Regional Water Quality Control Bd.* (2006) 135 Cal.App.4th 1377, 1384 (*Rancho Cucamonga*) ["consideration [should be] given to the [regional board's] interpretations of its own statutes and regulations"]; *Building Industry Assn.*, *supra*, 124 Cal.App.4th at p. 879, fn. 9 ["we do consider and give due deference to the Water Boards' statutory interpretations [of the CWA] in this case"]; see also *Cal. Building Industry Assn. v. Bay Area Air Quality Management Dist.* (2015) 62 Cal.4th 369, 389-390 [explaining that "an agency's expertise and technical knowledge, especially when it pertains to a complex technical statute, is relevant to the court's assessment of the value of an agency interpretation"].) In the direct challenge to the permit at issue here, the local agencies argued that the Regional Board exceeded even those requirements associated with the maximum extent practicable standard, an argument the appellate court rejected in an unpublished section of its opinion. Because of its failure to afford any deference to the Regional Board or to conduct an analysis more consistent with the relevant standard of review, the Commission essentially forces the Board to defend its decision twice: once on direct challenge and a second time before the Commission.

Conditions as prosaic as trash receptacle requirements initially may not seem to implicate the Regional Board's expertise. Yet its unique experience and technical competence matter even with respect to these conditions, because the use of such conditions implicates a decision not to use alternatives that might require greater conventional expert judgment to evaluate. Moreover, the Regional Board is likely to accumulate a distinct and greater degree of knowledge regarding issues such as the reactions of stakeholders to different requirements, and related factors relevant to determining which conditions are necessary to satisfy the CWA's maximum extent practicable standard.

8

The Commission acknowledged that the State Water Resources Control Board — as well as the EPA — believed the permit requirements did not exceed this federal standard. "The comments of the State Water Board and U.S. EPA," the Commission noted, "assert that the permit conditions merely implement a federal mandate under the federal Clean Water Act and its regulations." But the Commission afforded these conclusions no clear deference in determining whether the requirements were state mandates.

Nor is the majority correct in suggesting that the Commission had only a limited responsibility, if it had one at all, to extend any deference to the Regional Board. (See maj. opn., *ante*, at pp. 22-24.) The Regional Board's judgment as to whether the imposed permit conditions were necessary to comply with federal law was a prerequisite to the Commission's own task, which was to review the Board's determination in light of all the relevant evidence. To the extent ambiguity exists as to whether the Regional Board's conclusions incorporated any findings that these conditions were necessary to meet the federal standard (see *id.* at pp. 22-23), remand to clarify the Board's position is in order. By instead simply upholding the Commission's conclusion without remand, the majority displaces any meaningful role for the Regional Board's expert judgment.

The majority does so even though courts have routinely emphasized the pivotal role regional boards play in interpreting the CWA's intricate mandate. (See *State Water Board*, *supra*, 143 Cal.App.4th at p. 997; *Rancho Cucamonga*, *supra*, 135 Cal.App.4th at p. 1384.) And for good reason: If the Regional Board's judgment is that the trash receptacle and inspection requirements are necessary to control pollutant discharges to the maximum extent practicable, such a conclusion is well within the purview of its expertise. Unsurprisingly, then, we have never concluded that the technical knowledge relevant to interpreting the requirements of the CWA — a statute that lacks a safe harbor and where discerning what

9

phrases such as maximum extent practicable mean given existing conditions and technology is complex — lies beyond the ambit of the Regional Board's expertise, or otherwise proves distinct from the sort of expertise that merits deference.

Third, the Commission devoted insufficient attention in its analysis to the role of states in implementing the CWA, and to how that role can be harmonized with the significant protections against unfunded mandates that the state Constitution provides. (See Cal. Const., art. XIII B, § 6, subd. (a).) By allowing states to assume such an important role in implementing its provisions, the CWA reflects principles of cooperative federalism. (See 33 U.S.C. §§ 1251(b), 1342(b); see also *Boise Cascade Corp. v. EPA* (9th Cir. 1991) 942 F.2d 1427, 1430 ["The federal-state relationship established by the [Clean Water] Act is . . . illustrated in Congress' goal of encouraging states to 'assume the major role in the operation of the NPDES program' "].) In accordance with the CWA's express provisions, California chose to assume the responsibility for implementation of the NPDES program in the state — a role that requires further specification of permitting conditions. (See 33 U.S.C. § 1342(c)(3) [states must administer permitting programs "in accordance with requirements of this section," including compliance with the maximum extent practicable standard].) In the process, the state must comply with the constitutional protections against unfunded mandates requiring reimbursement of localities if permit conditions exceed what is necessary to comply with the relevant federal mandate. But given the nature of the relevant CWA provisions — and particularly the maximum extent practicable standard — it is wrong to assume that the conditions at issue in this case exceed what is necessary to comply with the CWA simply because neither the statute nor its regulations explicitly mention those conditions. The consequence of that assumption, moreover, risks discouraging the state from assuming cooperative federalism responsibilities — and may even encourage the state to withdraw from

10

administering the NPDES. Indeed, counsel for the state indicated at oral argument that if the Commission's reasoning were upheld — and the state were required to foot the bill for any conditions not expressly mentioned in the applicable federal statutes or regulations — it might think twice about entering into such arrangements of cooperative federalism.

In light of these concerns with the Commission's approach to this case, it is difficult to see the basis for — or utility of — upholding the Commission's decision, even under the inscrutable standard of review the majority employs. (See *California Youth Authority v. State Personnel Bd.* (2002) 104 Cal.App.4th 575, 586 [substantial evidence review requires that all evidence be considered, including evidence that does not support the agency's decision]; see also *Sierra Club v. U.S. Army Corps of Engineers* (2d Cir. 1983) 701 F.2d 1011, 1030 ["the court may properly be skeptical as to whether an [agency report's] conclusions have a substantial basis in fact if the responsible agency has apparently ignored the conflicting views of other agencies having pertinent expertise"].) The better course, in my view, would be for us to articulate the appropriate standard for evaluating the question whether these permit conditions are state mandates and then remand for the Commission to apply it in the first instance.

## II.

The Commission relied on a narrow approach that only compares the terms of a permit with the text of the CWA and its implementing regulations. Instead, the Commission should have employed a more flexible methodology in determining whether the permit conditions were federally mandated. Such a flexible approach accords with our prior case law. (See *City of Sacramento*, *supra*, 50 Cal.3d at p. 76 [whether local government appropriations are federally mandated and therefore exempt from taxing and spending limitations under section 9, subdivision (b), of article XIII B of the California Constitution depends

11

on, inter alia, the nature and purpose of the federal program, whether its design suggests an intent to coerce, when state or local participation began, and the legal and practical consequences of nonparticipation or withdrawal].)  Moreover, it would have the added benefit of not discouraging the state from participating in ventures of cooperative federalism.

The majority may be correct that the facts of *City of Sacramento* are distinguishable.  (See maj. opn., *ante*, at p. 21.)  In that case, the state risked forsaking subsidies and tax credits for its resident businesses if it failed to comply with federal law requiring that unemployment insurance protection be extended to local government employees.  (*Id.* at p. 15.)  Here, in contrast, the negative consequences of failing to comply with federal law may seem less severe, at least in fiscal terms:  the EPA may determine that the state is not in compliance with the CWA and reassert authority over permitting.  (See 33 U.S.C. § 1342(c)(3).)  But *City of Sacramento* nonetheless remains relevant, even though a precisely comparable level of coercion may not exist here.  The flexible approach we articulated in that case remains the best way to ensure that some weight is given to the Regional Board's technical expertise, and the conclusions resulting therefrom, while also taking account of the cooperative federalism arrangements built into the CWA.

So instead of adopting an approach foreign to our precedent, the Commission should have begun its analysis with the statutory and regulatory text — and then it should have considered other relevant materials and record evidence bearing on whether the permit conditions are necessary to satisfy federal law. Crucially, such evidence includes how the federal regulatory scheme operates in practice.  The Commission could have examined, for instance, previous permits issued by the EPA in similarly situated jurisdictions, comparing them to the inspection and trash receptacle requirements the Regional Board imposed here and

giving due consideration to the EPA's conclusion that the maximum extent practicable standard is applied in a highly site-specific and flexible manner in order to account for unique local challenges and conditions. (See 64 Fed. Reg. 68722, 68754 (Dec. 8, 1999).) The Commission could also have considered whether, instead of identifying permitting conditions necessary to comply with the CWA, the state shifted onto local governments responsibility to conduct inspections or provide trash receptacles. The majority wisely notes that these are factors the Commission *could* have examined. (See maj. opn., *ante*, at pp. 24-27.) But the Commission mentioned this evidence only briefly, failing to grapple in any meaningful way with its implications for the issue at hand. We should allow the Commission an opportunity to do so in the first instance.

The Commission should have also accorded appropriate deference to the Regional Board's conclusions regarding how best to comply with the federal maximum extent practicable standard. One way to ensure that such deference is given would be to place on the party seeking reimbursement the burden of demonstrating that the challenged permit conditions clearly exceed the federal standard, or that they were otherwise unnecessary to reduce pollutant discharges to the maximum extent practicable. Doing so would make sense where the state is implementing a federal program that envisions routine state participation, the federal program does not itself define the minimum degree of compliance required, and the state's implementing agency reasonably determines in its expertise that certain conditions are necessary to comply with the applicable federal standard.

\* \* \*

The Commission's decision — and the approach that produced it — fails to accord with existing law and with the nature of the applicable federal scheme. The state is not responsible for reimbursing localities for permit conditions that are

13

necessary to comply with federal law, a circumstance that renders interpretation of the CWA central to this case. A core principle of the CWA is to facilitate cooperative federalism, by allowing states to take on a critical responsibility in exchange for compliance with a set of demanding standards overseen by a federal agency capable of withdrawing approval for noncompliance. (See *Arkansas v. Oklahoma* (1992) 503 U.S. 91, 101 ["The Clean Water Act anticipates a partnership between the States and the Federal Government, animated by a shared objective: 'to restore and maintain the chemical, physical, and biological integrity of the Nation's waters' "]; *Shell Oil Co. v. Train* (9th Cir. 1978) 585 F.2d 408, 409 ["Shell's complaint must be read against the background of the cooperative federal-state scheme for the control of water pollution"].) The Commission failed to interpret the statute in light of nuances in its text and structure. And it failed to offer even a modicum of deference to the Regional Board's interpretation, despite the Board's clear expertise that the technical nature of the questions necessary to interpret the scope of the CWA demands.

Accordingly, I would remand the matter to the Court of Appeal with directions that it instruct the Commission to reconsider its decision. On reconsideration, the Commission should appropriately defer to the Regional Board, consider all relevant evidence bearing on the question at hand, and ensure the evidence clearly shows the challenged permit conditions were not necessary to comply with the federal mandate. This is the standard that most thoroughly reflects our existing law and the nature of the CWA. Any dilution of it exacerbates the risk of undermining the nuanced federal-state arrangement at the heart of the CWA.

**CUÉLLAR, J.**

**WE CONCUR:**
**LIU, J.**
**KRUGER, J.**

14

*See last page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** Department of Finance v. Commission on State Mandates
_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 220 Cal.App.4th 740
**Rehearing Granted**

_____

**Opinion No.** S214855
**Date Filed:** August 29, 2016
_____

**Court:** Superior
**County:** Los Angeles
**Judge:** Ann I. Jones

_____

**Counsel:**

Burhenn & Gest, Howard Gest and David W. Burhenn for Real Parties in Interest and Appellants County of Los Angeles, City of Bellflower, City of Carson, City of Commerce, City of Covina, City of Downey and City of Signal Hill.

John F. Krattli and Mark Saladino, County Counsel, and Judith A. Fries, Principal Deputy County Counsel for Real Party in Interest and Appellant County of Los Angeles

Meyers, Nave, Riback, Silver & Wilson, Gregory J. Newmark, John D. Bakker; Morrison & Foerster, Robert L. Falk and Megan B. Jennings for Alameda Countywide Clean Water Program, City/County Association of Governments of San Mateo County and Santa Clara Valley Urban Runoff Pollution Prevention Program as Amici Curiae on behalf of Real Parties in Interest and Appellants.

Somach Simmons & Dunn, Theresa A. Dunham, Nicholas A. Jacobs; Pamela J. Walls and Gregory P. Priamos, County Counsel (Riverside), Karin Watts-Bazan, Principal Deputy County Counsel, and Aaron C. Gettis, Deputy County Counsel, for California Stormwater Quality Association, Riverside County Flood Control and Water Conservation District and County of Riverside as Amici Curiae on behalf of Real Parties in Interest and Appellants.

Nicholas S. Chrisos, County Counsel (Orange), Ryan M.F. Baron and Ronald T. Magsaysay, Deputy County Counsel, for County of Orange as Amici Curiae on behalf of Real Parties in Interest and Appellants.

Best Best & Krieger, Shawn Hagerty and Rebecca Andrews for County of San Diego and 18 Cities in San Diego County as Amici Curiae on behalf of Real Parties in Interest and Appellants.

Thomas E. Montgomery, County Counsel (San Diego) and Timothy M. Barry, Chief Deputy County Counsel, for California State Association of Counties and League of California Cities as Amici Curiae on behalf of Real Parties in Interest and Appellants.

**Counsel:**

Andrew R. Henderson for Building Industry Legal Defense Foundation as Amicus Curiae on behalf of Real Parties in Interest and Appellants.

Best Best & Krieger and J. G. Andre Monette for City of Aliso Viejo, City of Lake Forest and City of Santa Ana as Amici Curiae on behalf of Real Parties in Interest and Appellants.

Michael R.W. Houston, City Attorney (Anaheim) for City of Anaheim as Amicus Curiae on behalf of Real Parties in Interest and Appellants.

Richards, Watson & Gershon and Candice K. Lee for City of Brea, City of Buena Park and City of Seal Beach as Amici Curiae on behalf of Real Parties in Interest and Appellants.

Baron J. Bettenhausen for City of Costa Mesa and City of Westminster as Amici Curiae on behalf of Real Parties in Interest and Appellants.

Aleshire & Wynder, Anthony R. Taylor and Wesley A. Miliband for City of Cypress as Amicus Curiae on behalf of Real Parties in Interest and Appellants.

Rutan & Tucker and Richard Montevideo for City of Dana Point as Amicus Curiae on behalf of Real Parties in Interest and Appellants.

Jennifer McGrath, City Attorney (Huntington Beach) and Michael Vigliotta, Chief Assistant City Attorney, for City of Huntington Beach as Amicus Curiae on behalf of Real Parties in Interest and Appellants.

Rutan & Tucker and Jeremy N. Jungreis for City of Irvine, City of San Clemente and City of Yorba Linda as Amici Curiae on behalf of Real Parties in Interest and Appellants.

Woodruff, Spradlin & Smart and M. Lois Bobak for City of Laguna Hills and City of Tustin as Amici Curiae on behalf of Real Parties in Interest and Appellants.

Terry E. Dixon for City of Laguna Niguel as Amicus Curiae on behalf of Real Parties in Interest and Appellants.

Mark K. Kitabayashi for City of Mission Viejo as Amicus Curiae on behalf of Real Parties in Interest and Appellants.

Aaron C. Harp for City of Newport Beach as Amicus Curiae on behalf of Real Parties in Interest and Appellants.

Wayne W. Winthers for City of Orange as Amicus Curiae on behalf of Real Parties in Interest and Appellants.

Kamala D. Harris, Attorney General, Douglas J. Woods, Assistant Attorney General, Peter K. Southworth, Kathleen A. Lynch, Tamar Pachter and Nelson R. Richards, Deputy Attorneys General, for Plaintiffs and Respondents.

No appearance for Defendant and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Howard Gest
Burhenn & Gest
624 South Grand Avenue, Suite 2200
Los Angeles, CA  90017
(213) 688-7715

Nelson R. Richards
Deputy Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA  94102-7004
(415) 703-5559